96 N.J. Super. 285 (1967)
232 A.2d 863
DAVID PRESENT, ISAAC PRESENT, AND EVA PRESENT, PLAINTIFFS,
v.
THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 10, 1967.
*288 Mr. Robert Scherling for plaintiffs.
Mr. Bertram M. Light, Jr. for defendant (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys).
ALLCORN, J.C.C. (temporarily assigned).
This action has been brought seeking to recover the proceeds of a policy of life insurance, issued by defendant on the life of Salomon Present.
It would appear (and the court finds) that defendant The United States Life Insurance Company in the City of New York, a corporation of the State of New York, qualified and was authorized to engage in the business of life insurance in and by the Republic of Cuba in 1940. In May 1943 the insured, who was then a citizen of Cuba, resident in Havana, made written application to defendant through its Havana branch office for the issuance of a policy of insurance on his life. At or about the same time he was examined in Cuba by a physician designated for that purpose by defendant. The written application and the report of the medical examination were thereafter forwarded to defendant's home office in New York City where, after processing, the application was approved and a policy of insurance was issued and sent to the Havana branch office. The application, report of the medical examination and the policy all were written in Spanish.
*289 When the policy was received in defendant's Havana branch office, it was, in accordance with the requirements of Cuban law, authenticated by defendant's attorney in fact in Cuba (the branch manager) by an endorsement on the face of the policy declaring that "the signatures of the foregoing officers [who executed the policy contract on behalf of the defendant] are authentic and that they are in the full exercise of their duties"; and the signature of the attorney in fact was, in turn, certified on the face of the policy by a notary public of Cuba as "authentic, same having been affixed in my presence." The policy was registered in the policy register and revenue stamps were affixed to it, also as required by Cuban law, after which it then was delivered to the insured. The initial premium was paid sometime during the first week of July 1943. At this juncture it might be well to note that all premiums required by the policy to be paid were in fact paid, and there is little question that all premium payments were made to defendant's representative in Cuba, in Cuban pesos.
The policy was a 23-year endowment. It bore the issue date of June 11, 1943 and insured the life of Salomon Present in the face amount of 5,000 pesos, which sum was payable to the insured if living on June 10, 1966, or to beneficiaries designated by the insured upon due proof of his death prior to June 10, 1966. The beneficiaries designated by the insured were the plaintiffs in this action, consisting of his wife Eva Present, and his two sons Isaac and David Present.
By the terms of the policy the proceeds were payable by defendant "at its office in Havana, Capital of the Republic of Cuba, or in the city of New York, United States of America." The policy provided further that all amounts payable thereunder "shall be paid in the national currency of the Republic of Cuba; [and] Moreover, wherever the words pesos and centavos or the respective symbols appear * * * they shall be construed as referring to the national currency of the Republic of Cuba, the currency in which this policy *290 was issued." All beneficiary changes were required to be endorsed on the policy "by the company at its office in Havana * * * or in New York City."
The death of the insured occurred on December 14, 1960, while he was still a citizen and resident of Cuba. He was survived by the three named beneficiaries. At the time of his death all of the beneficiaries were citizens and residents of Cuba.
Earlier, and culminating on January 1, 1959, the Castro group succeeded in completing its seizure of control of the government of Cuba. Recognition of the revolutionary group as the official government of Cuba was formally given by the United States of America on January 5, 1959. Although diplomatic relations between the two governments were severed early in 1961, recognition of the Castro government has never since been withdrawn by the United States Government.
In 1943, at the time of the application for and the issuance and delivery of the policy, both Cuban pesos and United States dollars were legal tender in Cuba. In 1948, however, Cuba created the National Bank of Cuba by its Law No. 13 of December 23, 1948. Pursuant to the authority contained in that Law No. 13, the President of Cuba on April 9, 1951, promulgated Decree No. 1384 which directed, in effect, that commencing July 1, 1951 the currency of the United States of America should cease to be legal tender in Cuba  although it thereafter continued to circulate freely within Cuba for some time, apparently to the middle or latter part of 1959.
By Law-Decree No. 569, promulgated by the President of Cuba under date of December 1, 1952, the Currency Stabilization Fund was vested with authority, among other things, to "regulate the import and export of currencies and securities" (Article 1 (c)); all natural and corporate persons transferring funds "to foreign points by means of checks, transfers" and other similar type orders for payment (except in purely commercial transactions) were required *291 to file certificates that the funds being remitted were not "directly or indirectly destined to countries * * * subject to special exchange regulations" (Article 4), and excepting generally all "international banking or trade operations whatever their nature" (Article 3). Following the coming to power and recognition of the Castro government, the Council of Ministers on September 23, 1959 adopted Law No. 568, whereby the various acts prohibited by Law-Decree No. 569 of December 1, 1952, as well as other acts in addition thereto, were expressly made "felonies of monetary contraband" (Article 1).
Ultimately, relations between the governments of Cuba and the United States of America became something less than amicable. And when, on July 6, 1960, the United States Congress enacted legislation authorizing a reduction of the quota of sugar that might be purchased from Cuba (74 Stat. 330; 7 U.S.C.A. § 1158), Cuba retaliated with the adoption on July 6, 1960 of its Law No. 851 by its Council of Ministers. After a prefatory recital of Cuba's grievance against the United States concerning the reduction of the sugar quota, "which forces the Revolutionary Government to adopt all and whatever measures it may deem appropriate or desirable" for the protection of Cuba's interests, and a further recital that "Article 24 of the Fundamental Law of the Republic authorizes the forced expropriation of property," Law No. 851 provided in Article 1 thereof as follows:
"Full authority is hereby conferred upon the President and the Prime Minister of the Republic in order that, acting jointly through appropriate resolutions whenever they shall deem it advisable or desirable for the protection of the national interests, they may proceed to nationalize, through forced expropriations, the properties or enterprises owned by physical and corporate persons who are nationals of the United States of North America, or of the enterprises in which such physical and corporate persons have an interest, even though they be organized under the Cuban laws."
*292 Under date of October 24, 1960 the President and the Prime Minister promulgated Resolution No. 3, which decreed in pertinent part:
"FIRST: The nationalization is provided, through forced expropriation, and therefore, adjudication is made in favor of the Cuban Government, in fee simple, of all properties and enterprises located in the national territory and the rights and actions derived from the operation thereof, which are owned by the natural or juridical persons who are natives of the United States of America, or operators of enterprises in which the natives of said country have a predominant interest, which are listed below:

* * * * * * * *

Group XX  Insurance Companies.

* * * * * * * *

3. United States Life Insurance Co.

* * * * * * * *
SECOND: Therefore, the Cuban Government is declared subrogated in the place and stead of the natural or juridical persons listed in the foregoing section in respect to the properties, rights and actions mentioned, as well as to the assets and liabilities constituting the capital of said enterprises.

* * * * * * * *
FOURTH: Pursuant to the provisions of Article 3 of Law No. 851 of July 6, 1960, the following agencies and organizations are designated for the administration of the properties or enterprises subject to the expropriation provided in this Resolution:

* * * * * * * *
9: The enterprises listed in Group XX are assigned to the Bank of Social Security of Cuba.

* * * * * * * *
FIFTH: The organizations indicated in the foregoing section shall appoint the officials who shall assume, on their behalf, the full administration of said enterprises and properties, without limitation of any kind, and when these administrations are assumed, they shall render a report in order to proceed with the appointment of the appraisers who will appraise the properties expropriated for the purposes of the payment thereof in the manner provided in Law No. 851 of July 6, 1960."
Parenthetically, it should be noted here that, as was said by the United States Supreme Court in commenting upon the likelihood of compensation under the method and formula provided in Law No. 851, "the possibility of payment under it may well be deemed illusory." Banco Nacional de *293 Cuba v. Sabbatino, 376 U.S. 398, 402, 84 S.Ct. 923, 927, 11 L.Ed.2d 804 (1964).
In any event, pursuant to Resolution No. 3 the armed militia on October 25, 1964 took physical possession of defendant's Havana office, required that all keys (office, safes, files, desks and the like) be surrendered, and ordered the manager (Francisco Leto) to leave. Simultaneously, or shortly thereafter, all of defendant's other tangible and intangible assets in Cuba, consisting largely of mortgages, other securities, and bank accounts aggregating approximately 2,300,000 pesos, were also seized by the Cuban government. A few days later Leto was directed to return to the office, where he was required to act as assistant to the member of the militia who had been designated manager.
By form letter dated November 8, 1960, on the letterhead of defendant (to which was added the word "NATIONALIZED"), all its Cuban policyholders were advised (1) of the nationalization of defendant, (2) "that its management will be carried on by the Bank of Social Insurance of Cuba," and (3) that "it is the intention of the Revolutionary Government to continue to operate all insurance companies and to guarantee insurance policies and contracts in force as well as those entered into in the future, on the same terms, amounts and conditions." The letter bore the signature of the manager of the company (nationalized).
According to the testimony of Leto, who remained in the employ of one or another of the agencies of the Cuban government that were operating the nationalized life insurance companies until he was able to leave Cuba in mid-1962, the business of these companies was carried on quite as usual. Most if not all of defendant's pre-nationalized staff was required to remain after nationalization, and premium notices were sent regularly, premiums collected, death claims and other claims under the policies presented and paid, policies surrendered and cancelled in exchange for their respective cash surrender values, and policy loans made to various insureds and repayment thereof accepted. Indeed, the nationalized *294 companies even paid dividends in 1961 and for a portion of 1962.
The one exception to business as usual after nationalization was the "black list"  consisting of the names of those persons prohibited from receiving payment of any funds in the ordinanry course of business in excess of 3,000 pesos. In addition, in all cases of death claims, after the filing of the proofs of loss, the death certificate and the original policy (or a statement that the policy could not be found), the beneficiary or beneficiaries had to come to the office of the nationalized company personally in order to receive the policy proceeds; and if a beneficiary did not do so, or if he were a nonresident of Cuba, his share of the policy proceeds would not be paid to him.
As has already been indicated, the insured here died on December 14, 1960, subsequent to the expropriation and nationalization of defendant. At that time the insured and all three beneficiaries were citizens and residents of Cuba. Plaintiff David Present remained in Cuba until May 5, 1961, at which time he came directly to the United States and settled in Newark, New Jersey, where he has resided since. Plaintiffs Isaac Present and Eva Present remained in Cuba and did not come to the United States until 1964, when they, too, made their homes in Newark, where they have since resided.
It is conceded by all parties that none of the plaintiffs, so long as he or she remained a resident of Cuba, was on the so-called black-list. Despite this fact, and notwithstanding that both David and Isaac Present denied any knowledge of the nationalization of the insurance companies (at least prior to David Present's removal to the United States), they both testified that no claim whatever was made in Cuba for payment of the proceeds of the policy following the death of the insured  though the government continued to operate defendant's business at what had been its Havana branch office for at least three months after the seizure on October 25, 1960, and at another location in *295 Havana thereafter. They further testified that no part of the proceeds had been received by any of the beneficiaries under this policy.
Approximately June 8, 1961, within a day or two after arriving in New York City from Havana via Miami, David Present called in person at defendant's home office in New York to inquire as to the payment of the policy proceeds. Another meeting was had on June 22, 1961, at which time defendant informed Present that, in view of the expropriation and nationalization, it could not honor his claim. Formal written demand was made upon defendant by David Present by letter dated November 6, 1961. Defendant wrote to him advising of the expropriation, which "deprived us of the status of insurer under the policies theretofore issued, * * * and substituted the Cuban State in our place and stead with respect to all our liabilities in Cuba and as insurer under our Cuban policies." The letter suggested that "any claim arising under the above policy should be submitted to the Cuban Government."
The within action was commenced thereafter against defendant for the recovery of the proceeds of the policy. Originally, David Present was the sole party plaintiff and sued in his own right as beneficiary and as attorney in fact for Isaac Present and Eva Present. The complaint was amended at the pretrial conference to add these two beneficiaries as parties plaintiff.
It is first urged by defendant that the action should be dismissed on the ground of forum non conveniens. The theory is that plaintiffs are Cuban citizens, the insured was a Cuban citizen, that everything to do with the application, the final authentication and the delivery of the policy took place in Cuba, and that the litigation will depend in large part on the applicability and meaning of Cuban law. Defendant is a corporation of the State of New York, where are located such records as are available with respect to this policy. New Jersey's connection with the action, it is asserted, is therefore minimal.
*296 Here all three plaintiffs are bona fide residents of New Jersey. David Present, for himself and as attorney in fact for the remaining plaintiffs, selected New Jersey, the state of his residence, as his choice of forum. Isaac and Eva Present, after coming to the United States and themselves becoming residents of New Jersey, ratified this choice by joining in the action as parties plaintiff. Defendant is a New York corporation, licensed to do business in New Jersey. Its home office is located in New York City  less than one-half hour by train, bus or automobile from Newark, the county seat of Essex County where the venue of this action was laid and where the case was tried.
The in-state residence of plaintiffs constitutes a rather substantial New Jersey connection with the litigation, and of itself apparently would justify the assumption and retention of jurisdiction by New Jersey. If there be added to this the fact that defendant is licensed to do business in New Jersey and is amenable to the service of process here, and, further, that there is completely absent any proof or even a suggestion that to subject this defendant to the jurisdiction of the New Jersey courts in this case "would violate traditional concepts of fair play and substantial justice," there can be no doubt that the ground urged has no merit. Wangler v. Harvey, 41 N.J. 277, 286 (1963); Starr v. Berry, 25 N.J. 573 (1958).
It is next urged that defendant was relieved of any and all liability under the policy by reason of the nationalization of its interests in Cuba, the expropriation and seizure of its assets, and the substitution of the government of Cuba in its place as the insurer on all policies written on the lives of Cuban nationals under the terms of Resolution No. 3, dated October 24, 1960.
The fundamental issue is whether or not the Cuban expropriation law is binding upon individuals who were citizens and residents of Cuba, and upon a corporation of a state of the United States which was carrying on the business of life insurance pursuant to prior authorization of the *297 Cuban government, at the time of the adoption of that expropriation law, particularly insofar as concerns the rights of those individuals and that corporation inter se.
Plaintiffs take the position that since the policy of insurance provided for payment of the proceeds in either Havana or New York City, the policy was thus "rendered * * * performable in New York City" at the option of the beneficiaries; and the beneficiaries having chosen performance in New York City, defendant thereby became obligated to perform in New York City. Thus, inasmuch as the law of the place of performance governs the determination of the rights of the parties to a contract, it is the law of the State of New York and not the law of the Republic of Cuba that controls.
Whichever the theory that may be applied as determinative  the place of the making of the contract, the place of performance of the contract, the intent of the parties, or the grouping of contacts or center of gravity  all point to Cuba as the sole jurisdiction concerned with this policy of insurance. From the moment it became effective, throughout its entire life and up to the moment that it matured by reason of the death of the insured, every contact, significant or otherwise, with this insurance contract took place within Cuba. Moreover, there can be no question but that the insured and the three beneficiaries designated by him (all citizens and residents of Cuba at the time of the inception of the contract in 1943 and continuously thereafter until the death of the insured on December 14, 1960) clearly intended that the contract would be performed in Cuba. And performed in Cuba it surely would have been had not plaintiffs decided to leave Cuba permanently. In these circumstances the law of Cuba should control the rights of the parties to this litigation with reference to the policy of insurance. Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475 (1961). See also, Mount Vernon Fire Ins. Co. v. Gillian, N.J. Super. (App. Div. 1967); *298 Restatement, Conflict of Laws 2d (Tentative Draft No. 6, 1960), § 332.
Plaintiffs have cited the cases of Theye Y Ajuria v. Pan American Life Ins. Co., 245 La. 755, 161 So.2d 70 (Sup. Ct. 1964), certiorari denied 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1965), and Pan American Life Ins. Co. v. Blanco, 362 F.2d 167 (5 Cir. 1966), which involved situations somewhat analogous to that present in this cause. In Theye plaintiff insured, a Cuban national, sued to recover the cash surrender value of a paid-up policy. Holding that the law of the place of making of the contract was controlling and that Louisiana constituted the situs in view of the fact that all premiums originally were paid in U.S. dollars at New Orleans and the policy proceeds also were payable at New Orleans, the court took the position that the Cuban expropriation law had no effect upon the rights and obligations of the parties to the policy contract.
Blanco involved four separate declaratory judgment proceedings to determine that certain annuity and insurance contracts owned by Cuban nationals now resident in Florida and Louisiana were still valid and binding upon the insurers and payable in U.S. dollars. The United States Court of Appeals, by virtue of the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), followed the decision in Theye as to the Louisiana residents, and finding that the policies owned by the Florida residents required performance in Florida followed the decision of a District Court of Appeal of Florida (Pan American Life Ins. Co. v. Recio, 154 So.2d 197 (1963), certiorari denied 377 U.S. 990, 84 S.Ct. 1908, 12 L.Ed.2d 1044 (1963)), which held that the place of performance of the contract controls. Quite aside from the distinguishing factual features present in the cited cases, neither the reasons nor the reasoning set forth as justifying the results were persuasive  particularly in the light of the rule laid down in Kievit.
*299 Given, then, the applicability of Cuban law, the remaining question concerns the validity of the expropriation decree (Resolution No. 3) and the basic law by which it was authorized (Law No. 851 of July 6, 1960).
Defendant produced at the trial Miguel F. Marquez, who had been a practicing attorney in Cuba from 1927 until 1940. At that time he became a member of the judiciary and, with the exception of a short interval, remained a judicial officer until 1960. From 1959 until the time of his resignation in June 1960 Marquez was a Senior Justice of the Supreme Court of Cuba, assigned to the part which handled constitutional and social warranties.
It was his opinion that under Cuban law this contract of insurance did not become effective until authentication by defendant's attorney in fact which took place in Cuba  and, therefore, that the contract of insurance was made in Cuba. It was his further opinion that both Law No. 851 and Resolution No. 3 were constitutionally valid and binding upon all Cuban nationals then resident in Cuba, as was the expropriation and nationalization of the insurance companies, and the substitution of the government of Cuba in the place and stead of the companies. He also testified that under the Cuban expropriation laws, once expropriation and nationalization had taken place, the Cuban government was subrogated in defendant's place and stead, both as to its assets and liabilities under all policies of insurance issued to Cuban nationals then resident in Cuba, and that defendant had no further liability thereunder. He testified, further, that there had been at least one decision by the Supreme Court of Cuba during his term of service as a member of that court, upholding the constitutionality and validity of Law No. 851 and Resolution No. 3 and the constitutionality of the expropriation of companies and the subrogation of the government in the place and stead of the companies under said law and resolution.
But the validity and binding effect of Law No. 851 and Resolution No. 3 need not rest alone on the opinion *300 of Marquez. The act of state doctrine, "a principle of decision binding on federal and state courts alike," requires that where the Government of the United States has recognized the government of another nation, the courts of the United States and of the several states may not inquire into the validity of the acts of such foreign sovereign government over property and persons within its jurisdiction  irrespective of whether or not the act in question may violate international law. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).
Sabbatino itself was concerned with the expropriation by the Cuban government under its Law No. 851, of certain sugar originally owned by a Cuban corporation whose capital stock was owned principally by residents of the United States. The case was a contest between an agency of the government of Cuba and the receiver of the owner corporation for the proceeds arising from the sale of the sugar to a third person. After a review of the history and effect of the law concerning the act of state doctrine, and after considering the question of whether it should be applied where the act of the foreign government may have constituted a violation of international law, the court concluded:
"However offensive to the public policy of this country and its constituent states an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application." (376 U.S., at pp. 436-437, 84 S.Ct., at pp. 944-945)
See also Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); Ricaud v. American Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918), and Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937).
The doctrine was also recognized and applied by the New York Court of Appeals in a case somewhat similar to *301 the one here under consideration, Dougherty v. Equitable Life Assurance Soc., 266 N.Y. 71, 193 N.E. 897 (1934). In that case some 20-odd actions were commenced on insurance policies previously issued by the insurer, in Russia, on the lives of persons who were citizens and, apparently, domiciled in Russia at the time of the issuance of the policies. Twenty-two actions sought a return of premiums paid, and other actions were for the face amounts of an endowment policy and a life policy, respectively. Following the establishment of the Soviet government in Russia in November, 1917, and on November 18, 1919 prior to any recognition of the Soviet government by the Government of the United States, the Soviet government promulgated a decree that provided that life insurance in all its forms was cancelled, and that all existing contracts of life insurance with insurance companies were cancelled and annulled. The Soviet government, however, did not assume the contractual obligations of the insurance companies.
The Dougherty court concluded that once the Government of the United States recognized the Soviet government (which recognition had taken place between the decree of November 18, 1919 and the commencement of the actions), such recognition acted retroactively and "the Soviet decrees became the laws of Russia, governing the policies here in question, and that obligations thereunder were at an end." 193 N.E., at p. 903. In the course of the decision Judge Crane, speaking for the majority of the court, stated:
"Let us reflect upon what would be the rulings of our courts were this same situation to arise in any other European country, where no open and violent revolution had taken place. Suppose one of the recognized nations of Europe should suddenly determine to nationalize its insurance companies, take the assets, cancel the policies, relieve the companies and the assured from all obligations, and establish a system of state insurance for all its citizens. Such action, I take it, would be binding upon our insurance companies doing business there as to policies there issued to citizens of that country, to be enforced according to the law of the land. Russian Volunteer Fleet v. United States, 282 U.S. 481, 492, 51 S.Ct. 229, 75 L.Ed. 473; Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 *302 N.Y. 372, 375, 138 N.E. 24; In re Russian Bank for Foreign Trade, [1933] 1 Ch. Div. 745, 766. Could the people of that nation come to this country, maintain actions on the policies, and recover upon the plea that the laws of their nation were not binding upon them and could not affect their contracts? Soviet Russia, as to all the insurance policies here in question, stands in the same position as if the government of Russia had never been interrupted by revolution; its decrees have the same force and effect as if they had been issued by the imperial government. It is difficult at times to turn the mind from actual facts to legal concepts, and vice versa. Here we must join the two. This is the result of recognition under the law of nations. Of course, we refer to redress in courts of law and not action by diplomacy or through the state department, with which we have nothing to do." (193 N.E., at p. 901)
To like effect are Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N.Y. 474, 14 N.E.2d 798 (Ct. App. 1938); Salimoff & Co. v. Standard Oil Co.; 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345 (Ct. App. 1933). See In re Estate of Spano, 49 N.J. 263 (1967).
It is true, of course, that on October 7, 1964, only six months after the decision of the United States Supreme Court in Sabbatino, the Congress adopted and the President signed the Foreign Assistance Act of 1964 (78 Stat. 1009), and that said act contained the so-called Hickenlooper Amendment (78 Stat. 1009, 1013; 22 U.S.C.A. § 2370 (e) (2)), which provides as follows:
"Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: Provided, That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular *303 case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court."
Even assuming the constitutional validity of the Hickenlooper Amendment (see Banco Nacional de Cuba v. Farr, 243 F. Supp. 957, 971 (S.D.N.Y., 1965)), it would appear to have no application here. The cited statute is operative only in those cases dealing with the enforcement of claims of persons whose property is asserted to have been confiscated or expropriated, and where the confiscation or expropriation was effected "by an act of that state in violation of the principles of international law."
In the present case plaintiffs do not seek to enforce any claim or claims arising out of the expropriation or confiscation of their property. So far as concerns their respective interests in the insurance policy which is the subject matter of this action, none of their property or rights in and to the policy or its proceeds have been confiscated or expropriated by Cuba. Indeed, when the Cuban government seized and expropriated defendant's assets, it expressly undertook and assumed the liability of defendant to its policyholders. And, had plaintiffs presented a death claim under the policy to the Cuban government agency charged with the administration of the nationalized insurance companies, they would have received payment of the full face amount of the policy shortly after the death of the insured. For reasons best known to themselves, they voluntarily refrained from making any such claim while any of them still remained in Cuba  i.e., from the death of the insured on December 14, 1960 to May 1964 when Isaac and Eva Present left Cuba.
Moreover, not only is there here no claim of property confiscated or expropriated by a foreign state asserted by the plaintiffs, but even if there had been such an expropriation of their property, it would not concern any principle or principles of international law. From the time of the making of the application for the policy, through its issuance, authentication and delivery, to the adoption of Law *304 No. 851, the promulgation of Resolution No. 3 and the actual physical seizure of defendant's assets and office, and beyond that to the time of the death of the insured, each of the three plaintiffs and the insured himself were and remained both citizens and residents of Cuba. As such citizens and domiciliaries they were subject to all laws enacted by Cuba  and all such laws were binding upon them and upon their property and property rights. Thus, the concern here is one of local law  the meaning and effect of the law of a nation upon three individuals who were citizens of and residents within the territory of that nation at all critical times; the concern does not touch on international law in the slightest degree.
Thus, it is apparent that the Hickenlooper Amendment is not applicable to the situation here present and does not bar the application of the act of state doctrine to this case.
In the light of the foregoing it is clear that the Cuban expropriation and nationalization law and decree of July and October 1960 were valid and binding upon all persons who were then citizens and residents of Cuba  including Salomon Present, the insured, and the three plaintiff-beneficiaries  to the extent that such persons were affected by said law and decree. By them the Cuban government was subrogated or substituted in the place and stead of defendant and assumed all liabilities then existing under policies of insurance held by citizens and residents of Cuba. Defendant's liability under said policy was thereby effectively terminated. Plaintiffs thus have no rights against defendant under the policy. Dougherty v. Equitable Life Assurance Soc., 266 N.Y. 71, 193 N.E. 897 (Ct. App. 1934).
Judgment will be entered in favor of defendant and against plaintiffs, without costs.