## A. CANTU V. W. A. BENNETT.

1. If a contract is made with regard to personal property, its construction is to be determined by the law of the place where it is made ; but if it refers to real property it is to be construed by the law where such property is situate.

2. The laws of Mexico do not hold a carrier responsible when the subject of the bailment is taken away by superior force or robbery.

3. The liability of a common carrier who undertakes in Mexico to convey goods from the territory of that government into Texas, is to be determined according to the laws of Mexico.

4. No damages can be recovered for the breach of a contract to convey money from Mexico to Texas, during the late war, to enable the bailee to carry on a contraband trade.

5. The transportation of coin or bullion from Mexico into Texas during the late civil war was in violation of law, and no contract for such transportation can form the basis for an action.

ERROR from Bexar. Tried below before the Hon. Geo. H. Noonan.

This suit was brought by Bennett against Cantu. Bennett alleged that Cantu, as a common carrier, through his agent, Q. Rodriguez, on April 6, 1865, received from

W. A. Bennett & Co., at Piedras Negras, in Mexico, a sum of $28,000 coin, to be delivered to W. A. Bennett at San Antonio, Texas, and that Cantu had failed to deliver $24,000 thereof.

The bill of lading, a Spanish document made in Mexico, was attached to the petition as a part thereof.

An attachment was sued out and levied upon the train belonging to Cantu, which was sold for $3290 under an order of court.

Cantu, by plea of *non est factum*, denied the execution of the bill of lading, and alleged that the money was taken from Quirino Rodriguez in the night by superior force of the soldiers of the Confederate States, then at war with the United States, without any negligence, default or want of due care on the part of Rodriguez.

That the bill of lading was made and delivered at Piedras Negras, Mexico; that the Mexican laws relative to common carriers were different from the English common law, excusing the carrier if the loss was caused by superior force, and that they govern the adjudication of controversies arising under the bill of lading.

He alleged that the suing out of the attachment was malicious and wrongful, and so, too, the sale of the property, estimating his damages at $17,000.

That war existed between the United States and the Confederate States ; that Piedras Negras, the place where the bill of lading was made, was in Mexico, a neutral country; that the freight was contraband of war ; that the commerce carried on between W. A. Bennett & Co., in Piedras Negras, and W. A. Bennett, of San Antonio, was illicit and against law; that such commerce was carried on through the town of Eagle Pass, in Texas, a port closed by the proclamation of the President of the United States and by acts of Congress.

Bennett moved to strike out the answer so far as it set

up the illegality of the transaction, and the court sustained the motion.

It appeared that Martin Muench (who, with W. A. Bennett, composed the firm W. A. Bennett & Co., and who had an interest of $4000 or more in the coin shipped), made an agreement with Quirino Rodriguez, the conductor of the train of A. Cantu, for the transportation of the coin. On April 5, 1865, the bill of lading was signed at Piedras Negras, Mexico.

On the ninth of April, 1865, the train camped on the Sabinal creek, Uvalde county, Texas, when, about 2 o'clock in the night, a party of men rode up, who, being hailed, alleged they were scouting for a couple of Mexicans who had killed a man in Castroville. They wanted to search the train, but being refused permission forced their way in, and before any alarm could be given, were upon the men of the train, disarmed them and took them off about a mile, where they guarded them until their confederates were off with the booty. The party consisted of about twenty-five to thirty soldiers in uniforms, armed with pistols, six-shooters and rifles.

Twenty-four thousand dollars were taken; the remainder was delivered to the consignee by Rodriguez.

Verdict and judgment for Bennett for $11,210, from which Cantu appealed.

The eighth assignment of error refers to the exclusion by the court of the depositions of Mexican attorneys relative to the legality of the bill of lading, and the interpretation of the same under the laws of Mexico.

*W. B. Leigh*, for plaintiff in error, in an exhaustive brief, contended:

1. Cantu could not be bound by Rodriguez, whose acts were not expressly nor impliedly sanctioned by him:

2. The whole business was unlawful so far as Bennett was concerned.

- 3. The "public enemy" by "*vis major*" had taken the freight; consequently the carrier was not responsible.

*Wælder & Upson*, for defendant in error, contended that contracts made in one place to be executed in another are to be governed by the laws of the place of performance, and therefore the depositions of the Mexican attorneys were rightly excluded, citing Andrews v. Pond, 13 Peters, 65; Story on Conf. of Laws, Sec. 280; 2 Vol. Kent Com.

They also insisted that money could not be considered as contraband unless intended for the use of the belligerent into whose territory it was carried; that even if contraband, it was not *ipso facto* forfeited, but was only liable to seizure while *in transitu*.

WALKER, J.—Were we to attempt to discuss the multifarious questions raised upon the twelve bills of exception and the twenty-six reasons given for a new trial, and the fourteen assignments of error, we fear it would be greatly to the prejudice of the other business of this court; but after a very careful consideration and analysis of the whole record, we think we can do the case justice by a brief statement of what we consider the law of the case. This suit grew out of a transaction which may be briefly stated.

W. A. Bennett and his partner, Martin Muench, early in the month of April, 1865, during the late civil war, wanted to bring some $28,000 of silver coin from Peidras Negras, in Mexico, to San Antonio, Texas, for what purpose the statement of facts does not inform us in direct terms. Ambrosio Cantu, of Monterey, Mexico, was the owner of a train of mule teams, which, the evidence tells us, had

been engaged during the greater period of the war in hauling cotton from Texas to Mexico. It appears that W. A. Bennett & Co. had two places of business, one at San Antonio, Texas, and the other at Piedras Negras, Mexico; and the fact is irresistibly forced upon our mind, as a deduction from all the facts in this case, that these men were engaged in a contraband trade, and that their object in bringing a large sum of money, to-wit, $28,000, from Mexico to Texas at the time they made the shipment, was to enable them to carry on this contraband trade.

On the fifth of April, 1865, although most of the Confederate forces in the field had surrendered, the war was not declared at an end until long afterwards, nor had the blockade, established under the non-intercourse acts of July 13, 1861, and May 20, 1862, been raised.

The Supreme Court of the United States, in the case of the *Reform*, 3 Wal., 617, says: "The act of July 13, 1861, to provide *for the collection of duties on imposts*, and for other purposes, and which, by one section, on a proclamation made by the President, makes intercourse between citizens of those parts of the United States in insurrection against its government with citizens of the rest of the United States unlawful, 'so long as such condition of hostilities should continue,' was not a temporary act, though passed during the late Rebellion ; nor on the cessation of hostilities did forfeitures which had been incurred after proclamation, under that section, cease to be capable of enforcement."

We do not propose to hold the shipment of this coin as contraband because it was probably intended to purchase cotton, for the evidence does not warrant a statement of this conclusion.

But in the case of Gay's gold, 13 Wallace, 358, the court hold: 1. The treasury regulation No. 22, forbidding all

transportation of coin or bullion to any State or section declared by the President's proclamation to be in insurrection, was valid, and was authorized by the act of May 20, 1862. 2. Gold coin in packages, and not used for traveling expenses, was merchandise in 1864, in point of fact, and was within the mischief to be remedied by the non-intercourse acts of July 31, 1861, and May 20, 1862. 3. The proclamation of pardon and amnesty of President Johnson of December 25, 1865, was limited to persons "who participated in the late insurrection or rebellion," and to the offense of "treason against the United States, or adhering to their enemies during the late civil war."

The rule here laid down cannot be mistaken as the rule which must govern this case.

In the case of the schooner *John Gilpin* and cargo, Blatchford's Prin. Cases, 291, the court say: "Trade of every description with an enemy during war is, by the law of nations, inhibited to the subjects of the nation prosecuting the war."

And by statute (12 U. S. Stat. at Large, 257), all commercial intercourse between the citizens of the loyal States and those belonging to the insurrectionary States is unlawful, and the property acquired through such intercourse is subject to forfeiture.

The same doctrine is laid down in the United States v. Wythenbury, Revenue Cases, 66.

There is a learned discussion and a very clear definition of what is contraband in the *Peterhoff*, 5 Wallace, 28.

We will not discuss this branch of the case further at present, but will now notice the sixth and seventh assignments for error. They relate to the admission of hearsay evidence, and this was improper.

The eighth assignment brings us to a more interesting question.

The appellant proposed in the court below to prove the

law of Mexico governing the liability of common carriers, which the court ruled out.

There has been much discussion in the books and with the courts touching the *lex loci contractu*, the *lex domicilii*, the *lex loci rei sitae*, the *lex fori*, etc.

But so much of the law touching these questions as can have any reference to this case is summed up in few words on pages 318 and 319 of Parsons Mercantile Law, 2 Edition.  "The general principles upon which the law of place depends are four:  First, every sovereignty can bind by its laws all persons and all things within the limits of the State.  Second, no law has any force or authority of its own beyond those limits.  Third, by the comity of nations, aided in our case as to the several States by the peculiar and close relation between the States and for some purposes by a constitutional provision, the laws of foreign States have a qualified force and influence, which it is perhaps impossible to define or describe with precision.  The fourth of these general rules is, that a contract which is not valid where it is made, is valid nowhere else; and one which is valid where it is made, is valid everywhere.

"As contracts relate either to movable or immovables, or, to use the phraseology of our own law, to personal or to real property, the following distinction is taken:  If the contract refers to personal property (which never has a fixed place, and is therefore called, in some systems of law, movable property), the place of the contract governs by its law the construction and effect of the contract. But if the contract refers to real property, it is construed and applied by the law of the place where that real property is situated, without reference, so far as the title is concerned, to the law of the place of the contract."

To the same point see Kent's Com., Vol. 2, 454; Story's Conflict of Laws, 263.

The civil law as in force in Mexico does not hold a carrier responsible where the subject of the bailment is taken away or destroyed by a *vis major*, and robbery is so considered when perpetrated by an irresistible force. (Domat, 484; Story on Bailments, Secs. 26, 458, 459, 488.)

The bill of lading signed by Rodrigeuz, the major domo, or train master, for the coin, which has become the subject matter of this suit, shows that it was executed on the sixth day of April, 1865, at Piedras Negras, Mexico.

The bailment was of personal property, which, according to Parsons, has no fixed place, and is movable property.

If, then, the contract in this case had been otherwise legal and binding, it must have been enforced in accordance with the law of Mexico. And the court, treating it as a valid contract, should have admitted the evidence in proof of the law of that country.

But for the reasons already given we cannot enforce this contract, nor can we award damages for its breach.

The judgment in this case must follow our own rulings in Whitis v. Polk, 26 Texas, 602, and Converse v. Miller, 33 Texas, 216, and is therefore reversed and the cause dismissed.

REVERSED AND DISMISSED.