**OCCIDENTAL OF UMM AL QAYWAYN, INC.**

v.

**CITIES SERVICE OIL CO., et al., ("Lykavitos").**

**OCCIDENTAL OF UMM AL QAYWAYN, INC.**

v.

**KERR–McGEE CORPORATION ("Anglo-Maersk").**

**OCCIDENTAL OF UMM AL QAYWAYN, INC.**

v.

**A CERTAIN CARGO LADEN ABOARD DAUNTLESS COLOCOTRONIS.**

Civ. A. Nos. 74–1192, 75–0033 and 74–868.

United States District Court, W. D. Louisiana, Lake Charles Division.

July 8, 1975.

464

Scofield, Bergstedt & Gerard, Lake Charles, La., (Thomas M. Bergstedt, Lake Charles, La., of counsel), Montgomery, Barnett, Brown & Read, New Orleans, La. (Henry J. Read, New Orleans, La., of counsel), Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, La. (David L. Stone, New Orleans, La., of counsel), for plaintiffs.

Jones, Kimball, Patin, Harper, Tete & Wetherill, Lake Charles, La. (John A. Patin, Lake Charles, La., of counsel), Liskow & Lewis, New Orleans, La. (L. Linton Morgan, New Orleans, La., of counsel), Wyman, Bautzer, Rothman & Kuchel, Beverly Hills, Cal. (Allan B. Goldman, Beverly Hills, Cal., of counsel), for defendants.

EDWIN F. HUNTER, Jr., Chief Judge:

Plaintiff seeks to recover crude oil seized on board three tankers. The oil was extracted from the seabed of the Arabian Gulf at a point located nine miles off the coast of the Island of Abu Musa.

These consolidated cases represent only a small portion of the pending litigation arising out of the same set of facts. As of May 9, 1975, there were approximately 58 separate actions: 23 in the Western District of Louisiana, 12 in the Eastern District of Louisiana, 3 in the Eastern District of Texas, 2 in the Virgin Islands, 17 in the Calcasieu Parish, Louisiana State Court, and one in the Jefferson County, Texas State Court.

Buttes Gas & Oil Company and Occidental are holders of offshore oil concession agreements granted by two adjacent sheikdoms. Sharjah and Iran refused to recognize Occidental's concession and instead recognized the concession of Buttes, thus enabling Buttes to commence drilling operations and produce the oil. This action, plaintiff argues, is tantamount to a confiscation, and the Hickenlooper Amendment requires that we adjudicate the controversy.

Defendants originally filed a motion to dismiss, which motion, by the interaction of F.R.Civ.P. 12 and 56, has now been converted into a motion for summary judgment. Numerous authenticated documents and affidavits appear in the record.

Due to the many contradictory factual assertions, it is appropriate to synopsize the uncontested facts and to set out the most important of those contested. In 1970 plaintiff filed a federal cause of action under the Sherman Act and claimed a deprivation of the enjoyment of the precise gas concession here involved. Buttes Gas & Oil Company, the major defendant in that suit, moved to dismiss. The motion was granted in a thorough and well-reasoned opinion on March 17, 1971. The decision was pegged on the basic proposition that the Act of State doctrine precluded further adjudication and that the exception to the doctrine contained in the Sabbatino Amendment (Hickenlooper) was by its terms extremely narrow and not applicable to the situation presented. *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, (C.D.Cal.1971). The Court of Appeals for the Ninth Circuit affirmed at 461 F.2d 1261 (1972). The United States Supreme Court denied a writ of certiorari, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

There are two Trucial States, Sharjah and Umm Al Qaywayn, located on the

southeastern end of the Persian Gulf. Forty nautical miles into the Gulf is an island named Abu Musa. At the northern end of the Gulf, approximately 50 nautical miles from Abu Musa, is the country of Iran.

In 1964 the Rulers of Umm and Sharjah allegedly entered into a treaty agreement establishing a seabed border agreement, pursuant to which the limit of the territorial waters of Abu Musa was three (3) nautical miles and the area beyond this three-mile limit was Umm Al Qaywayn's continental shelf.[1] Sharjah, by an unpublished decree of September 10, 1969, extended its territorial waters to a point 12 nautical miles off Abu Musa, a decree assertedly contrary to the 1964 treaty.[2]

On November 18, 1969, plaintiff obtained from the Ruler of Umm a concession granting it the exclusive right to explore for and extract oil underlying the territorial and offshore waters of Umm. Subsequent to plaintiff's obtention of its concession from Umm, Buttes was granted an oil and gas concession by Sharjah on December 29, 1969, encompassing the territorial waters of Sharjah, its islands, including Abu Musa, and the seabed and subsoil lying beneath those waters. Each concession agreement was approved by the British government. On April 7, 1970, Sharjah and Buttes executed an amendment to the original concession extending the concession area to 12 miles off Abu Musa's coast. Plaintiff asserts that although the British Foreign Office was not "taken in" by the backdated decree and concession amendment, it endeavored to settle amicably the respective Territorial Waters claims of Umm and Sharjah by requiring both plaintiff and Buttes to cease any drilling operations and to submit their demands to mediation.

In the meantime, Iran, acting through the National Iranian Oil Company, set forth its claim to Abu Musa, and enunciated a 12-mile Territorial Waters jurisdiction. Great Britain left the Persian Gulf on or about December 1, 1971. Immediately prior thereto Sharjah and Iran settled their dispute pursuant to an agreement which called for the joint possession of Abu Musa and the disputed area. The agreement reserved the title question to the future. It called for a 50–50 split in any oil royalties. Iran also recognized the validity of the Sharjah lease concession agreement to Buttes. In April of 1972, Buttes commenced drilling operations in the disputed area (nine miles east of Abu Musa) and later entered into joint venture agreements with the other defendants and/or their subsidiaries. In June of 1973, before the oil in question was extracted from the disputed area, Umm—the source of Occidental's concession rights—terminated that concession agreement, allegedly because of Occidental's failure to pay monies required under the agreement. Under the auspices of Sharjah and Iran, Buttes began extracting oil from the contested area, storing it temporarily on the "Baraka 1" and then shipping it to the United States. In September of 1974 this oil began arriving in the United States.

Defendants argue that dismissal and/or summary judgment should be required on five independent grounds:

A. Application of res judicata doctrine;

---

1. This agreement is in the form of unilateral declarations made by the Rulers of Sharjah and Umm Al Qaywayn. They do not mention the Continental Shelf, but plaintiff is confident that after full discovery and a trial on the merits that the Court would conclude that these declarations established the boundary of the Continental Shelf of Umm at the three nautical mile limit off the territorial waters of Abu Musa.

2. Plaintiff asserts, in effect, that this was a backdated fraudulent Territorial Waters Decree and should not be considered by the Court. The record does not contain a copy of the decree, but it has been alleged affirmatively in the plaintiff's petition (Complaint, paragraph 8).

B. Application of collateral estoppel doctrine;

C. The Act of States Doctrine precludes inquiry into the acts of foreign states called into question;

D. Resolution of the issues would require adjudication of a boundary dispute between foreign nations;

E. The absence of Sharjah, Iran and Umm Al Qaywayn, which are indispensable parties.

### PLAINTIFF'S BASIC POSITION

Occidental strenuously insists that defendants are complicating the simple, and that we must look through "these eristic maneuvers." In oral argument counsel stated:

> "As surprising as it may sound, after the volume of briefs that have been filed, this is, in essence, a one issue law suit. The issue is: 'was Umm al Qaywayn a sovereign on November 18, 1969 when the concession was granted?'"

This presents an issue of fact that will require the Court's determination (Tr. 58–63). Put another way:

> "Occidental's position is that the court must merely determine that Umm al Qaywayn was sovereign over the plaintiff's entire concession on November 18, 1969. If the plaintiff's concession was valid and in force in November, 1969, it remained valid and in force in November, 1971. Intervening territorial claims, however asserted, could not effect the plaintiff's vested property right in its concession, because not even an actual change in sovereignty alters vested property rights." [3]

Based on these arguments, plaintiff asserts that defendants

> "cannot obtain summary judgment on the basis of assertions made in brief,

however frantic, nor on the basis of selected readings, whether in farsi, urdu, swahili, or for that matter, english."

### RES JUDICATA AND COLLATERAL ESTOPPEL AS A RESULT OF OCCIDENTAL PETROLEUM CORPORATION VS. BUTTES GAS & OIL COMPANY, 331 F.Supp. 92 (C. D.CALIFORNIA, 1971), AFFIRMED AT 461 F.2d 1261 (9 CIR., 1972), WRITS DENIED 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed 2d 221.

The prior action and the instant one assert the same right: an alleged exclusive right to explore and develop the petroleum resources of the disputed area in the Persian Gulf. The wrong asserted is basically the same—that is, the interference and deprivation of its lease concession rights in that area. But the cause of action is different and at least one new event transpired after the California decision became final—the delivery of the oil in the United States.

 Res judicata requires two suits involving the same cause of action. *Lawlor v. National Screen Service Corporation* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Exhibitors Poster Exchange, Inc. v. National Screen Service Corporation,* 421 F.2d 1313, 1316 (5th Cir. 1970). Comparison of the complaint in the instant case with the one in California demonstrates that the causes of action are not the same. In California, Occidental alleged a violation of antitrust laws based on various activities of Buttes and others, including an *attempted* confiscation of its oil concession. The present complaint asserts the right to recover oil within the control of the Court, and a claim traced through an alleged confiscation of a concession agreement. Despite the almost identical factual background, the two causes of action are different.

---

3. *United States v. Rice,* 17 U.S. (4 Wheat.) 246, 4 L.Ed. 562 (1819); *Cobb v. United States,* 191 F.2d 604 (9th Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952).

The motion to dismiss on the basis of res judicata must be denied. It is.

 Collateral estoppel forecloses relitigation of all issues litigated in a prior proceeding. It is immaterial that two actions are different, tried on different grounds, or instituted for different purposes and seek different relief. *Parker v. McKeithen,* 488 F.2d 553 (1974). But a legal finding may be successfully utilized as collateral estoppel only when it is evident from the pleadings and the record that the finding was necessary to the final decree and was foreseeably of importance in possible future litigation. *Hyman v. Regenstein,* 258 F.2d 502–510 (5th Cir., 1958). Our duty is to examine the decision of the Court in the prior litigation and determine the precise perimeter of the judgment. The California court reached two very pertinent ultimate conclusions:

1. The claim alleged could not prevail without an inquiry into the authority for and motivation of the acts of foreign sovereigns, and the Act of State Doctrine precluded such an inquiry.

2. The portion of the complaint in issue did not fall within the ambit of the Hickenlooper Amendment, for the reason that the complaint refers to "an attempted confiscation," whereas the statute applies only to a "confiscation or other taking."

These two determinations were the only necessary and essential requisites to the dismissal. The present complaint alleges an actual confiscation, but it was surely foreseeable that the two other observations made by Judge Pregerson would be of importance in possible future litigation:

3. "The conduct of Sharjah did not amount to an effective confiscation; rather, plaintiffs were allegedly deprived of their concession only by the cooperative effect of a number of acts of state, of which Sharjah's claims were not the most efficacious. This is not a situation at which the Sabbatino Amendment was aimed." 331 F. Supp. at 112.

4. "Regardless of the wording of the complaint, it would be conceptually and prudentially hazardous to treat the territorial waters claim of Sharjah as a 'confiscation' subject to adjudication under the international legal standards governing that kind of act. Claims to territory are a different matter from the expropriation of corporate property within or appertaining to that territory." (footnote 33, at page 112).

Armed with this language, defendants' insist there should be no litigation encore. The passages contained in paragraphs "(3)" and "(4)" cannot be ignored, especially in view of the language used by the Ninth Circuit in the per curiam affirmation:

"The dismissal was correct. We affirm for reasons stated in the district court's opinion." (461 F.2d 1261).

and by Judge Pregerson, below:

"The pleading is insufficient to invoke the Sabbatino Amendment for several reasons." (underscoring ours).

 The enigma—what "reasons stated in the district court's opinion" formed the basis for the affirmance? Our attempt to carve our way through this litigation has not given us the answer. Doubt must be resolved by denial. Accordingly, we *decline* to hold that the Doctrine of Collateral Estoppel by Judgment operates to prevent plaintiff from re-litigating the issue of the applicability of the Hickenlooper Amendment.

## INDISPENSABLE PARTIES

Defendants persist in arguing that Sharjah, Iran and Umm Al Qaywayn are indispensable parties. Arguably, an adjudication in plaintiff's behalf might greatly affect the territorial and financial interest of Sharjah, Iran and Umm. Be that as it may, the argument of in-

dispensability and the decisions cited in support are not persuasive in this factual situation.

■ None of the absent sovereigns can be joined. As to Sharjah and Iran, the alleged confiscating sovereigns, a holding of indispensability would render illusory the very rights that the Hickenlooper Amendment seeks to preserve. Rule 19 of the Federal Rules of Civil Procedure will permit this action to proceed in absence of the sovereigns who cannot be joined. Rule 19(b) applies where joinder of a missing party is not feasible:

> (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Federal Rules of Civil Procedure, Rule 19(b).

Rule 19 directs a pragmatic analysis, not one dictated by the application of formal categories. Note of the Advisory Committee on Civil Rules, 39 F.R.D. 69, 90–93 (1966); see *Kaplan, Continuing Work of the Civil Committee; 1966 Amendments of the Federal Rules of Civil Procedure* (I), 81 Harv.L.Rev. 356, 363, 367 (1967). The application and effect of Rule 19(b) are discussed in the opinion of the United States Supreme Court in the case of *Provident Tradesmen's Bank and Trust Company v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L. Ed.2d 936 (1968).

■ We conclude that practical consideration of the rights and interest of the present parties to the suit and of those of the absentees require that the case proceed in this forum even though the absentees cannot be brought into the action.

The motion to dismiss pegged on the absence of indispensable parties is denied.

### BOUNDARY DISPUTE—ACT OF STATE DOCTRINE

In the California case, Judge Pregerson: "The determination of foreign states' boundaries is not a permissible function of this court," (331 F.Supp. at 103) but declined to dismiss because the antitrust allegations did not require a determination of foreign boundaries. Our appreciation of the law and the issues in the instant case require a different approach.

■ Throughout this litigation defendants have treated as an unassailable rule of law the premise that a United States Court cannot decide a case involving the private rights of private parties to property if the adjudication of those rights requires a collateral determination of any kind with respect to boundaries. We do not read the jurisprudence to be that all-embracing. We prefer a narrower construction, and conclude that if the resolution of the boundary dispute requires inquiry into the authenticity and motivations of the acts of foreign states, then and in that case judicial resolution would be inappropriate. This issue reflects the unconventional nature of this litigation, which arises out of the claims and acts of a number of foreign states. The concerns aroused by the boundary aspects are intricately interwoven with the Act of State Doctrine. The two must be considered together, vis-a-vis the Hickenlooper Amendment.

## ACT OF STATE DOCTRINE

To set the stage for a discussion of what the Court feels is the most substantial ground for defendants' motion, we take the liberty of quoting extensively from the district court's opinion in *Occidental Petroleum Corp.*, supra, at pp. 108–109:

"In *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L. Ed. 456 (1897), the Supreme Court first definitively held that 'the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.' This 'classic American statement of the act of state doctrine' was reaffirmed by the court most recently in *Banco Nacional de Cuba Sabbatino*, 376 U.S. 398, 416–418, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964). In the *Sabbatino* case, the bases of the doctrine were at last explicitly elaborated. The act of state doctrine, it was held, is not required by international law. 376 U.S. at 421–422, 84 S. Ct. 923. Nor is it compelled by notions of sovereign authority, although they 'do bear upon the wisdom of employing' it. *Id.* Finally, the doctrine is not required by the Constitution. 376 U.S. at 423–424, 84 S.Ct. 923.

"The act of state doctrine does, however, have 'constitutional' underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere."

"In sum, the doctrine is a reflection of the executive's primary competency in foreign affairs, and an acknowledgment of the fact that in passing upon foreign governmental acts the judiciary may hinder or embarass the conduct of our foreign relations. See 376 U.S. at 427–428, 431–433, 84 S.Ct. 923."

A more descriptive justification of the doctrine is found in *Frazier v. Foreign Bondholders Protective Council*, 283 App.Div. 44, 125 N.Y.S.2d 900, 903 (1953):

"It is a doctrine born of expediency, nourished in the council halls of nations as well as the courts of justice. Its dominant motif is political. It has gained statute in the world of international diplomacy and politics, where an 'incident' involving the dignity of nations is measured by its explosive potential as well as its legal implications."

 When foreign governments perform an act of state which changes the relationship of the parties touching the "res," and this change results in an accomplished fact (as here), then it would be an affront to such a foreign government for courts of the United States to hold that such act was a nullity. The entire fabric of the complaint is woven out of attacks on the validity of, or questioning the reasons for, the acts of Sharjah, Iran and Umm, with respect to the precise rights which plaintiff asserts. It traces a series of wrongs of foreign states to reveal why the lease agreement cancellation by Umm was invalid and why neither Sharjah nor Iran had a right to honor the lease contract (concession) by Buttes and its joint venturers; or to put it another way, to explain why the failure to honor Occidental's concession agreement constituted a confiscation. Nothing in *Rice* (supra) and *Cobb* (supra) will relieve this court from a forbidden inquiry into acts of state unless, of course, it is the Hickenlooper Amendment.

A listing of numerous acts of state appear in plaintiff's petition:

(1) Plaintiff claims title and right to the oil on the ground that Umm Al Qaywayn validly granted it an exclusive right to explore and exploit the disputed area, and never validly terminated that right. Umm Al Qaywayn's notice of termination was invalid, and attempts to explain the invalidity on the ground that Umm Al Qaywayn's sovereignty over the area was suspended, in fact, "as a result of" actions of Sharjah and Iran * * *."

(2) Sharjah "allegedly issued" an unpublished decree dated September 10, 1969—a decree assertedly contrary to treaty obligations with the British Government—"purporting to extend" its territorial waters to twelve nautical miles.

(3) Sharjah granted Buttes an oil concession on December 29, 1969.

(4) The concession was amended on April 7, 1970, "so as to extend" the concession area from three to twelve miles off the coast of Abu Musa, and this was done in furtherance of the purposes of the Ruler of Sharjah to enlarge the concession area granted by him on December 29, 1969, to Buttes, so as to include the structure in the disputed area, and "thus to enable the Ruler of Sharjah to share with Buttes the substantial revenues to be derived from the underwater structure."

(5) Sharjah, in May of 1970, rejected a suggestion of the British Foreign Office that Occidental be allowed to operate within the disputed area pending arbitration.

(6) Sharjah, in May of 1970, requested the British Foreign Office to prohibit all operations in the area pending determination of the dispute by arbitration.

(7) In May of 1970 Iran made a claim to Abu Musa which was "without foundation and contrary to historical fact * * *."

(8) In July of 1970 Sharjah consented to the British Government's appointment of a mediator.

(9) Sharjah rejected the mediator's proposals, which were made on or about September 28, 1970.

(10) In November, 1971, Sharjah and Iran "confected" a "Memorandum of Understanding" relating to Abu Musa, allegedly in disregard of Occidental's vested rights to operate in the concession area. The Memorandum of Understanding provided that neither Iran nor Sharjah would recognize the other's claim of sovereignty over Abu Musa; that Iranian troops would arrive and occupy part of the island; that both Sharjah and Iran would recognize the breadth of Abu Musa's territorial sea as twelve nautical miles; that exploitation of the petroleum resources of the seabed and subsoil beneath the territorial sea would be conducted by Buttes; and that half the governmental oil revenues would be paid directly to Iran and the other half to Sharjah.

## HICKENLOOPER

[11] No doubt disturbed by the deteriorating conditions between the United States and Cuba and by the Supreme Court decision in *Sabbatino*, Congress, on October 2, 1964, quickly passed the Hickenlooper Amendment to the Foreign Assistance Act of 1964, the avowed purpose of which was to "reverse in part the recent decision of the Supreme Court in *Banco Nacional de Cuba v. Sabbatino*" (U. S. Senate Foreign Relations Committee, July 10, 1964). The statute provides:

"Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming

through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law * * *; *Provided,* That this subparagraph shall not be applicable * * * (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court."

This so-called exception to the acts of state doctrine encountered strenuous opposition from the executive branch during its passage through Congress.[4] In a similar vein, the Amendment has been very stringently applied and strictly construed. This limited exception controls only when (a) a claim of title or other right to property is asserted[5] (b) based upon a confiscation or other taking (c) in violation of international law.

The issue quickly narrows: Are defendants precluded from invoking the act of state doctrine by the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C.A. 2370(e)(2)? We believe the answer must be in the negative.

▆ FIRST: Giving full consideration to the asserted new events,[6] we agree with Judge Pregerson's observation that "it would be conceptually and prudentially hazardous to treat the territorial waters claim of Sharjah as a 'con-

fiscation' under the legal standards governing that kind of act." We find nothing in the wording of the statute or in its legislative history which would give plausibility to Occidental's major premise that the conduct of Sharjah and/or Iran amounted to a "confiscation." We cannot ascribe to the belief that a confiscation of plaintiff's concession agreement occurred when Sharjah and Iran allegedly extended their territorial waters claim to include the disputed area. Territorial waters claims are subject to a body of international law, wholly different from that related to confiscations. See e. g. *McDougal and Burke, The Public Order of Oceans,* 486–98, 520–61; see also *Major Middle Eastern Problems in International Law, American Enterprise Institute for Public Policy Research* (1972). We hold that the conduct set forth in the complaint did not amount to a confiscation within the meaning of the Hickenlooper Amendment. Contrariwise, the record reveals that plaintiffs were allegedly deprived of the enjoyment of their concession only by the cooperative effect of a number of acts of state by Sharjah, Iran and Umm Al Qaywayn. This is not a situation at which the Sabbatino Amendment was aimed. *Occidental Petroleum Corp. v. Buttes Gas & Oil,* supra. On its face a claim to submerged lands and their superadjacent waters coincidental with a lease for the exploration of mineral resources could not conceivably have been envisioned by Congress to rise to the magnitude of a confiscation within the narrow confines of the Hickenlooper Amendment.

4. For an extensive review of the amendment's pertinent legislative history see *Banco Nacional de Cuba v. First National City Bank of N.Y.,* 431 F.2d 394 (2nd Cir., 1970) at pp. 400–402.

5. For the Sabbatino Amendment to be applicable, circumstances must precisely fit the statutory language. In *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 295 N.Y.S.2d 433, 444, 242 N.E.2d 704, 712 (1968) the Chief Judge declared that
"[it was] abundantly clear * * * that Congress was not attempting to as-

sure a remedy in American courts for every kind of monetary loss resulting from actions, even unjust actions, of foreign governments. The law is restricted, manifestly, to the kind of problem exemplified by the *Sabbatino* case itself, a claim of title or other right to *specific property* which had been expropriated abroad." (Emphasis added).

6. The Sharjah-Iran annexation, followed by non-recognition of Occidental's concession and the importation of oil into the United States.

**SECONDLY:** The United States Court of Appeals for the Second Circuit has on at least two occasions made an exhaustive analysis of the Amendment's legislative history and concluded that its effect is limited to cases involving claims of title with respect to American owned property nationalized by a foreign government, and that the amendment was inapplicable to contract claims. *Menendez v. Saks & Co.*, 485 F.2d 1355 at 1372 (1973), cert. granted on other grounds, 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758; *Banco Nacional de Cuba*, 431 F.2d 394 (1970).[7] Further support for this interpretation of the Hickenlooper Amendment is found in *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 295 N.Y.2d 433, 242 N.E.2d 704 (1968), where the New York Court of Appeals held that a claim for breach of contract is not a " 'claim of title or other right to property' within the meaning of the Hickenlooper Amendment," and that the repudiation of a contractual obligation does not amount to a "confiscation or other taking," as those terms are used in the statute.[8]

Applying these principles to the instant case, what was allegedly confiscated? It was not the oil which was extracted from the disputed area by Buttes in 1974. It was not an oil well or an oil mine. The well from which the oil was extracted was owned by Buttes and developed and drilled by them, pursuant to their concession agreement with Sharjah. The property allegedly confiscated was the Occidental concession. It was not the confiscation of an oil well. The "concession agreement" was nothing more than a lease contract under which the lessee agreed to pay certain considerations to the lessor for the privilege of exploring, drilling for, and extracting oil. A true and correct Xerox copy of the agreement has been filed by plaintiff as its Exhibit "1."

Simply stated, the concession agreement was a contractual right to explore for and extract oil from a given area. This agreement did not constitute "a claim of title or other right of property" within the meaning of the amendment. We so hold.[9]

**THIRDLY:** Plaintiff, in order to prevail on the merits, must prove its lease agreement was valid as of the date the oil was extracted. In June of 1973, before the oil in question was extracted from the disputed area, Umm Al Qaywayn, the source of plaintiff's concession agreement, terminated the agreement.[10] The act of state doctrine precludes inquiry into reasons for or the validity of the cancellation unless Hickenlooper is applicable.[11] We do not be-

---

7. Upon its review of the Banco case, the Supreme Court did not disturb the conclusion reached by the Second Circuit that the Hickenlooper Amendment was inapplicable. See *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 at 780, note 5, 92 S. Ct. 1808, 32 L.Ed.2d 466.

8. See also 12 A.L.R. Fed. at 815.

9. Significantly, defendants have not pressed the conclusions reached as to the confiscation and/or repudiation of contract rights. This would have been inconsistent with their insistence that we dismiss on the basis of "res judicata" and/or "collateral estoppel." We note, too, plaintiff's suggestion in footnote 3 of its reply memorandum that the legislative history set out in *Banco* (431 F. 2d 394) indicates that the amendment is applicable to "oil concessions." We do not agree. The colloquy between Professor Olmstead and Congressman Frazier had to do with ore or oil from an expropriated mine or well.

10. Article 26.1 of the Agreement:
 "The Ruler shall have the right to terminate this Agreement upon three (3) months prior written notice to Occidental:
 "(a) if Occidental has not fulfilled the obligations provided for in Article 4 hereof; or
 "(b) if Occidental shall be in default of an arbitration award under the arbitration provisions of this Agreement."

11. Occidental's case is premised on the proposition that Umm was sovereign over the disputed area on November 18, 1969. The cancellation, they argue, is to be disregarded because Umm is no longer sovereign. But

lieve it applicable and so conclude. *Franch v. Banco Nacional de Cuba*, 23 N.Y.2nd 46, 295 N.Y.S.2d 433, 242 N.E. 2d 704.

■ FOURTHLY: "Hickenlooper" requires title to confiscated property and its proceeds to be determined as of the date of confiscation. The petition alleges this occurred in November of 1971. Concededly, in 1970 a boundary dispute existed between Iran, Sharjah and Umm. To decide whether or not there was a confiscation would require a determination of that boundary dispute. Who owned the disputed area as of November, 1971? Even as of today, Iran and Sharjah have deferred a determination of title as between them. Then, too, Umm's possible ownership is not being ignored (30% of Sharjah's share of what it collects from Buttes).

Summarizing: Practical considerations underlying a specific situation must be precisely examined to avoid conclusions making for eventual confusion and conflict. The instant case presents one of those problems for the rational solution of which it becomes necessary to take soundings. The case before us is this: Sharjah and Iran recognize the Buttes' concession. Umm cancelled the Occidental concession, but participates in the rentals received from Buttes. In light of this history and what we perceive to be the purpose of Hickenlooper, I just cannot bring myself to believe that Congress intended to permit United States Courts to tell these three foreign countries: "You are wrong and we are right as to the ownership of your offshore waters."

The motion for summary judgment should be granted in each case. So ordered.

*DEFENDANTS' REQUEST FOR INJUNCTION TO ENJOIN ALL FURTHER LITIGATION BASED ON THE SUBJECT MATTER*

■ The facts alleged in each of the 58 pending actions and the manner in which they are set forth are virtually identical. The factual distinction is that different ships and their cargoes are involved. There are no inherent obstacles preventing a district court from issuing orders which affect litigation in other courts, state or federal. This court has the discretionary power to issue a single injunction forbidding further proceedings in the pending cases awaiting the final outcome of this litigation. However, we feel it would be highly prejudicial to issue such an order. This is so because the order would deprive the plaintiff of its statutory remedy with respect to further shipments of oil by the defendants to the United States before a final determination of its claim. The request for injunctive relief to enjoin *all* further litigation is denied.

as we see it, the question of who was sovereign and when, are themselves inquiries into the reasons for and/or the validity of acts of state. It barely requires emphasis that the Ruler of Sharjah pays the Ruler of Umm 30% of Sharjah's share of the total revenue accruing to it and payable by Buttes pursuant to its concession agreement with Sharjah and Iran (See affidavit of D. Paul Fitzgibbon, filed by plaintiff in these proceedings).