Nelson Bunker HUNT et al.,
Appellants/Appellees,

v.

COASTAL STATES GAS PRODUCING
COMPANY et al.,
Appellees/Appellants.

No. 1809.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Aug. 23, 1978.

Rehearings Denied Sept. 13, 1978.

A. B. Conant, Jr., Drew R. Heard, Cecil W. Casterline, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, for appellants.

Dan G. Matthews, Daniel K. Hedges, Linda Leuchter Addison, Fulbright & Jaworski, Houston, for appellees.

CIRE, Justice.

Nelson Bunker Hunt, Herbert Hunt and Lamar Hunt (collectively referred to as "Hunt") originally instituted a suit for conversion against Coastal States Gas Producing Company and Coastal States Marketing, Inc. (collectively referred to as "Coastal States") claiming that Coastal States had converted oil to which Hunt was entitled by virtue of a concession agreement with Libya. Coastal States answered and filed a counterclaim for tortious interference with its contract and business opportunities. Coastal States moved for summary judgment on Hunt's claim. Hunt moved for summary judgment only on the issue of liability in the original suit and for a general summary judgment against Coastal States on Coastal States' counterclaim. The trial court granted Coastal States' motion for summary judgment in the original suit and Hunt's motion for summary judgment on the counterclaim. Both sides appeal.

In 1957 Libya granted a concession (Concession Number 65) to Nelson Bunker Hunt. The concession gave Hunt the right, for fifty years, to explore, drill and extract oil. Subsequently, Herbert Hunt and Lamar Hunt acquired an interest in the concession pursuant to an agreement with Nelson Bunker Hunt. In 1960, with the approval of the Libyan government, the Hunts assigned a one-half undivided interest in the concession to British Petroleum Exploration Company, Limited.

In 1961 oil was discovered in the concession (hereinafter called the Sarir field). Oil was produced in marketable quantities by 1967. In 1971, the Libyan government nationalized the operations and interest of British Petroleum in the Sarir field and transferred its rights to the Arabian Gulf Exploration Company (AGECO).

In 1973, the Libyan government, by the enactment of Libyan Law Number 42, nationalized Hunt's interest in the Sarir field. Article 1 of Libyan Law Number 42 provides:

> The rights of Nelson Bunker Hunt in Oil Concession Agreement No. 65 shall be nationalized, and ownership of all the funds, rights, assets and shares of Nelson Bunker Hunt in the said concession shall revert to the State, including specifically all the rights relating to the installations and facilities for prospecting, exploration and drilling for, and production of, crude oil and natural gas, as well as for transportation, processing, storage and export, and other assets and rights relating to the said concession.

Hunt's rights and assets were than transferred and assigned to AGECO. Hunt subsequently published notices in newspapers throughout the world claiming that the Libyan nationalization of the Sarir field violated international law and was of no effect, and additionally threatened suit against anyone who came into possession of Sarir oil. In May 1973, approximately the time the nationalization decree was issued, Coastal States entered into a contract with AGECO to purchase oil from the Sarir field. The oil was then transported to a refinery in Italy. This contract was consummated and performed despite Hunt's claims

against Libya. Hunt ultimately settled his claims against Libya in May 1975. In that agreement, Hunt released any and all claims against the Libyan government which arose out of the nationalization of the Sarir field. Hunt was paid approximately $19,000,000.00 as consideration.

In August, 1973 Hunt instituted this suit against Coastal States for conversion of the Sarir field oil. Hunt claimed that the Libyan government confiscated his property in violation of: (1) the concession agreement between the parties; (2) international law; and (3) the public policy of the United States and that such an illegal confiscation could not and did not affect Hunt's rights to recover against subsequent converters of oil from the Sarir field. Hunt claimed that Coastal States acquired the petroleum from the Sarir field and exercised dominion and control over such oil with full knowledge of and inconsistent with Hunt's possessory rights, title and interest. Coastal States counterclaimed against Hunt for tortious interference with Coastal States' contractual relations and business opportunities.

At a pre-trial hearing both Hunt and Coastal States called experts in international and foreign law who expressed their opinions regarding the application of Libyan and international law to the facts presented in this case. Following the hearing, the parties submitted motions for summary judgment.

In October 1977 the trial court entered its final judgment, granting Coastal States' motion for summary judgment on Hunt's conversion claim, denying Hunt's motion for summary judgment on the issue of liability and granting Hunt's motion for summary judgment on Coastal States' claim for tortious interference with Coastal States' contracts and business opportunities. The trial court additionally filed conclusions of law stating that Libyan law determined the interest acquired by Hunt in the Sarir field, and under Libyan law, Hunt did not acquire title to the oil, but merely a contract right to extract the oil. The trial court also found that the Act of State Doctrine applied to this case and foreclosed the trial court from inquiring into the validity of the Libyan nationalization of Hunt's interest in the Sarir field, and, no exception to this doctrine was applicable. Regarding Coastal States counterclaim for tortious interference, the court held that, as a matter of law, Hunt's actions in giving notice of his claim to oil from the Sarir field did not violate either state or federal law, and his actions in giving such notice were neither malicious or capricious.

Both parties appeal from the judgment rendered by the trial court.

## APPEAL BY HUNT

Hunt asserts seven points of error attacking the trial court's findings as to the applicability of the Act of State Doctrine, the applicability of Libyan law rather than international law, and its finding that Hunt had only a contractual right to extract the oil.

Since Coastal States' possession of the oil is clearly rightful, and does not constitute a conversion, if its transferor's title was good, the critical issue in the resolution of Hunt's whole suit is whether Libya's expropriation was valid. This, in turn, presents the question of whether a Texas court may inquire into the acts done by a foreign sovereign. Such inquiry is generally barred by the Act of State Doctrine. In his first two points Hunt asserts four reasons why the Act of State Doctrine, which bars inquiry into the validity of the actions of an expropriating nation, should not apply to the Libyan nationalization in this case: (1) the State Department has expressed its views that the Libyan nationalization was violative of international law and it would be unlikely that the executive branch would request American courts to refrain from considering the validity of the acts of Libya on the grounds of the Act of State Doctrine (the *Bernstein* exception); (2) Libya, by nationalizing the oil field and marketing the petroleum in international commerce did not act officially as a sovereign (the commercial act exception); (3) the Hickenlooper amendment, designed to undercut the Act of State Doctrine is applicable; and (4)

Libya and Hunt, parties to the concession agreement, included an "applicable law" clause in the concession agreement which is unambiguous and these terms should be given effect regardless of the Act of State Doctrine.

For reasons discussed herein, we affirm the summary judgment granted against Hunt.

## THE ACT OF STATE DOCTRINE

■ The Act of State Doctrine is a judicially created doctrine of restraint. The classic formulation of that doctrine was restated in *Banco Nacional de Cuba v. Sabbatino* :

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964) *quoting Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897).

■ Hunt claims under his second point that the *Bernstein* exception to this doctrine applies and permits judicial inquiry into the validity of the Libyan nationalization. *See Bernstein v. N.V. Nederlandsche-Amerikaansche Etc.*, 210 F.2d 375 (2d Cir. 1954). We disagree.

It is highly questionable whether there is such an exception. In *First National City Bank v. Banco Nacional de Cuba*, Justice Rehnquist defined and analyzed the *Bernstein* exception and concluded:

> [T]hat where the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy, that doctrine should not be applied by the courts. In so doing, we of

course adopt and approve the so-called *Bernstein* exception to the act of state doctrine.

406 U.S. 759, 768, 92 S.Ct. 1808, 1813, 32 L.Ed.2d 466 (1972). However, the dissent, comprised of four justices, pointed out that only Chief Justice Berger and Justice White concurred with Justice Rehnquist. Two additional justices concurred with Justice Rehnquist only in result. The dissent explicitly rejected the *Bernstein* exception and reasoned that the validity of a foreign act of state is a "political question not cognizable in our courts." 406 U.S. at 787–88, 92 S.Ct. at 1823. Additionally, Justice Powell, in his concurring opinion disapproved of the *Bernstein* exception:

> I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction. Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine.

406 U.S. at 773, 92 S.Ct. at 1816. Therefore, we conclude that the *Bernstein* exception is no longer viable, and we do not consider whether the expressions of the State Department regarding the Libyan nationalization were sufficient expressions to the court. *See Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 725, 96 S.Ct. 1854, 1875–76, 48 L.Ed.2d 301 (1976) (dissenting opinion); *Menendez v. Saks and Company*, 485 F.2d 1355, 1373 (2d Cir. 1973) *rev'd on other grounds sub nom., Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). *See also Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 77–79 (2d Cir. 1977). Furthermore, we decline to give credence to the exception due to the separation of powers rationale enunciated in Justice Harlan's opinion in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and in Justice Powell's concurring opinion in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 773–76, 92 S.Ct. 1808, 1816–17, 32 L.Ed.2d 466 (1972).

Hunt's second contention in his first point of error is that when a foreign government engages in a "commercial" activity, such as Libya's conduct with regard to the Sarir field, the Act of State Doctrine does not apply and a court can inquire into the validity of the nationalization decree. In Hunt's brief, he directs this court to consider language from *Alfred Dunhill of London v. Republic of Cuba* :

> [W]e are nevertheless persuaded by the arguments of petitioner and by those of the United States that the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities. Our cases have not yet gone so far, and we decline to expand their reach . . . .

425 U.S. 682, 695, 96 S.Ct. 1854, 1861 (1976). The aforementioned language is authored by Mr. Justice White. However, upon examination of *Dunhill*, we conclude that this language is not the language of a majority of the Supreme Court and the validity or existence of this exception is likewise doubtful. But, in any event, when a foreign state has exercised a sovereign power, as Libya did here, it is a governmental, and not a commercial, act. *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 720, 96 S.Ct. 1854, 1873, 48 L.Ed.2d 301 (1976) (dissenting opinion). *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977).

In Hunt's second point, he claims that the trial court committed error when it refused to apply the Hickenlooper amendment to obviate and avoid the Act of State Doctrine. The Hickenlooper amendment (sometimes referred to as the *Sabbatino* amendment) was enacted by Congress in reaction to the *Sabbatino* holding. The pertinent portions state that:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is

asserted by any party including a foreign state . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law. 22 U.S.C. § 2370(e)(2). We recognize at the outset that this exception is extremely narrow. *Occidental of Umm Al Qaywayn, Inc. v. Cities Serv. Oil Co.*, 396 F.Supp. 461, 471 (W.D.La.1975); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, 112 (C.D.Cal.1971), aff'd, 461 F.2d 1261 (9th Cir. 1972), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221; *United Mexican States v. Ashley*, 556 S.W.2d 784, 786 (Tex.Sup. 1977).

Three elements must exist in order to avoid the Act of State Doctrine under the Hickenlooper amendment. First, expropriated property must come within the territorial jurisdiction of the United States. Second, the act of the expropriating nation must be in violation of international law. Third, the asserted claim must be a claim of title or other right to property.

Without considering the merits of the first two requirements we conclude that the Hickenlooper amendment is inapplicable to this case because Hunt acquired only a contract right in the concession agreement. *See Occidental of Umm Al Qaywayn, Inc. v. Cities Serv. Oil Co.*, 396 F.Supp. 461, 472 (W.D.La.1975); *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 448, 242 N.E.2d 704, 714 (N.Y.Ct.App.1968).

There was some disagreement among the testifying experts as to whether, in construing the contract, international law or Libyan law applied. But international law does not govern the nature of the rights conferred by the contract. Under well established Texas conflict of laws rules, Libya substantive law governs the interpretation and construction of the concession agreement. This is true whether the oil is characterized as personalty or realty since Libya is both the place of the contract's execution and performance and the location of its subject matter. *Cantu v. Bennett*, 39 Tex. 303 (1873); *see Austin*

*Building Co. v. National Union Fire Ins. Co.,* 432 S.W.2d 697 (Tex.Sup.1968) (personalty); *Colden v. Alexander,* 141 Tex. 34, 171 S.W.2d 328 (1943) (realty). Although expert witnesses called by the parties also differed on the meaning and effect of the applicable law, the law is explicitly stated and clear. Libyan Petroleum Law Number 25 of 1955 provides:

(1) All petroleum in Libya in its natural state in strata is the property of the Libyan State.

(2) No person shall explore or prospect for, mine or produce petroleum in any part of Libya, unless authorized by a permit or concession issued under this law.

The original agreement executed in 1957 provided, in clause 1, that:

. . . the Commission hereby grants to the Company, subject to the conditions hereof and the provisions of the Law, the exclusive right for a period of . . . fifty . . . . years to carry out geological investigations, including aerial surveys, and to search for by any other means, bore for, and extract petroleum within and over the area outlined in red on the map annexed hereto of approximately . . . . 32944. . . . . . . . . . . square kilometres situated in the . . . . . 3. . . . . . . Zone bounded and defined . . . .

The Company shall also have the right to take away such petroleum whether by pipeline or otherwise from the concession area and to use, process, store, export and dispose of the same.

Clause 29 of that agreement, titled "Interpretation," states that the "Law" means the Petroleum Law of 1955.

Further, the amended agreement voluntarily entered into by Hunt and Libya in January 1966, approximately five years before Libya's gradual nationalization of the Sarir field, and after oil had been discovered, again specifically refers to and is governed by Petroleum Law Number 25 of 1955. Clause 16 of that agreement states:

(1) The Government of Libya will take all the steps necessary to ensure that the Company enjoys all the rights conferred by the Concession. The contractual rights expressly created by this concession shall not be altered except by mutual consent of the parties.

(2) This Concession shall throughout the period of its validity be construed in accordance with the Petroleum Law and the Regulations in force on the date of the execution of the agreement of amendment by which this paragraph 2 was incorporated into this concession agreement. Any amendment to or repeal of such Regulations shall not affect the contractual rights of the Company without its consent.

This language is significant in that it not only refers to Hunt's rights as "contractual" but also recognizes Libya's ownership of the oil. As this court has recently had occasion to point out, phrases in important, multimillion dollar contracts are not inserted loosely, and it is presumed that the parties to such an agreement were aware of the significance and effect of each word agreed upon. *See City of Houston v. R. F. Ball Construction Company, Inc.,* Tex.Civ. App., 570 S.W.2d 75 (Tex.Civ.App.—Houston [14th Dist.] 1978).

Hunt argues that it is clause 28(7) of the concession agreement, not clause 29 or clause 16, that governs the rights of the parties, and, under that clause international law applies. Clause 28(7) reads:

This Concession shall be governed by and interpreted in accordance with the principles of law of Libya common to the principles of International Law and in the absence of such common principles, then by and in accordance with the general principles of law, including such of those principles as may have been applied by international tribunals.

■ This clause, however, deals solely with arbitration. It speaks not to the nature of the rights granted and acquired under the concession agreement, but merely to the enforcement of those rights following a breach of the agreement; it deals with remedies, not substantive rights. In

this regard we agree with the analysis offered by K. Lipstein in 29 Transactions of the Grotius Society, *Conflict of Laws Before International Tribunals (II)*, 55–56 (1943):

> First, the tribunal must decide whether a private party interest exists in the light of domestic law and in whom such interest is vested.

> \* \* \* \* \* \*

> Secondly; once the preliminary investigation has established the existence of a private law right, the tribunal must determine whether the violation of the right acquired under municipal law constitutes an illegal act under international law.

Libyan Law Number 42 did expropriate the physical assets of Hunt but Libya never relinquished its ownership of the oil, and consequently cannot have expropriated it from Hunt. While Libya's actions presumably constituted a breach of the concession agreement with Hunt, they do not amount to a confiscation of the oil since Hunt never acquired a valid claim of title or other right in the unsevered oil but only a right to the oil which Hunt extracted. Therefore, the Hickenlooper amendment does not apply and the Act of State Doctrine precludes judicial inquiry into Libya's actions. *See Occidental of Umm Al Qaywayn, Inc. v. Cities Serv. Oil Co.*, 396 F.Supp. 461, 472 (W.D.La.1975); *French v. Banco Nacional de Cuba*, 295 N.Y.S.2d 433, 448–49, 242 N.E.2d 704, 714–15 (N.Y.Ct.App.1968).

 The fourth exception which Hunt asserts in an attempt to avoid the application of the Act of State Doctrine is that it simply does not apply when the private enterprise and expropriating country have jointly executed an unambiguous agreement which enunciates controlling legal principles. Hunt points to the "applicable law" clause (clause 28(7)) in the 1957 concession agreement, and then directs this court to language in *Banco Nacional de Cuba v. Sabbatino*, in which Hunt claims that the Act of State Doctrine does not apply:

> [T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. 398, 428, 84 S.Ct. 923, 940 (1964). We have examined subsequent cases which cite the aforementioned language and conclude it is unclear what type of "unambiguous agreement" the opinion refers to. However, we conclude that this language is inapplicable to this case since, as we have held, Libya did not expropriate property (the oil) from Hunt.

We have examined all of Hunt's points of error and, having concluded that the Act of State Doctrine bars judicial inquiry into the validity of Libya's actions, the trial court's grant of summary judgment against Hunt on his claim for conversion is hereby affirmed.

### APPEAL BY COASTAL STATES

Coastal States, in its nine points of error, claims that the trial court erred when it granted Hunt's motion for summary judgment on Coastal States' claims of tortious interference with its contract and business opportunities. We have considered these points and they are hereby overruled.

 An essential element to the claims for tortious interference with contractual relations and business relations is that the defendant's acts must have no legal justification. We have examined the record and conclude that as a matter of law Hunt's actions were legally justified and there is no genuine issue of fact on this essential element. *See Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex. Sup.1970).

The trial court concluded that Hunt had a contractual interest in the Sarir field at the time of nationalization. This interest was repudiated by Libya and the record clearly

shows that Hunt instituted litigation against various corporations in the international community due to their dealings in Sarir oil and additionally apprised corporations of his intent to file suit if indeed they dealt with such oil. However, these actions were legally justified due to the repudiation of the concession agreement. *See Terry v. Zachry*, 272 S.W.2d 157 (Tex.Civ.App.—San Antonio 1954, writ ref'd n. r. e.). *See also St. Joseph Pro. Bldg. Corp. v. American Nat. Ins. Co.*, 511 S.W.2d 578 (Tex.Civ.App. —Houston [14th Dist.] 1974, writ ref'd n. r. e.).

The court properly granted Hunt's motion for summary judgment on Coastal States' claims of tortious interference with business contracts and business relations; there is no genuine issue of fact regarding the essential element of no legal justification.

The trial court's judgment is affirmed.