**Nelson Bunker HUNT et al., Petitioners,**

v.

**COASTAL STATES GAS PRODUCING COMPANY, Respondent.**

No. B–7984.

Supreme Court of Texas.

June 13, 1979.

Rehearing Denied July 18, 1979.

Shank, Irwin, Conant, Williamson & Grevelle, A. B. Conant, Jr., Cecil W. Casterline and Drew R. Heard, Dallas, for petitioners.

Fulbright & Jaworski, Dan G. Matthews, Daniel K. Hedges and Linda L. Addison, Jerome P. Owens, Houston, for respondent.

BARROW, Justice.

This suit was instituted by Nelson Bunker Hunt, Herbert Hunt and Lamar Hunt (Hunt) seeking damages against Coastal States Gas Producing Company and Coastal States Marketing, Inc. (Coastal States) for the alleged conversion of oil to which Hunt was entitled by virtue of a concession agreement with Libya. Coastal States counterclaimed for damages for Hunt's allegedly tortious interference with the contract and business opportunities of Coastal States. Both parties moved for summary judgment on the issue of liability after extensive development of the case. The trial court denied relief on all claims and the court of civil appeals affirmed. 570 S.W.2d 503. We affirm the judgment of the court of civil appeals.

In 1957 the Government of Libya granted Hunt a concession which gave him the right, for fifty years, to explore, drill and extract oil in an area now identified as the Sarir field. Hunt assigned a one-half undivided interest in this concession to British Petroleum Exploration Company, Ltd. (British Petroleum) in 1960. Oil was discovered in the concession area in 1961 and, by 1967, it was produced in marketable quantities. In September 1969, Colonel Mu'ammar al-Qadhafi assumed power in Libya under a new government, the Revolutionary Command Council, and commenced making changes in the existing contractual relations with the various oil producers holding concession agreements with Libya. In 1971, the Libyan Government nationalized the operations and interest of British Petroleum in the Sarir field and transferred its rights to the Arabian Gulf Exploration Company (AGECO). AGECO is a corporation whose entire capital stock is owned by the Libyan Government.

On June 20, 1973, by Libyan Law No. 42 of 1973, the Libyan Government nationalized all the rights and assets of Hunt in the concession agreement and assigned these rights to AGECO. Although Libya agreed to pay compensation, the amount was to be determined by a committee designated by the State. In response to this action, Hunt published notices in newspapers throughout the world claiming that the Libyan nationalization violated international law and threatened suit against anyone who came into possession of Sarir oil. In May 1973, Coastal States entered into a contract with AGECO to purchase oil from the Sarir field and it continued to purchase oil under this contract despite Hunt's claims against Libya and threatened suits. This oil was transported by Coastal States to a refinery in Italy where it was processed and sold to third parties. It was stipulated that a portion of the products derived from this oil was subsequently taken to the United States, although it was not stipulated that Coastal States transported or caused any of such products to be brought here. Nevertheless, Coastal States is domiciled in the United States and, at least, the net proceeds derived from the Sarir oil were brought here and are the basis of Hunt's suit for conversion.

British Petroleum was a party to the controversy with Coastal States at one time, but it subsequently entered into a full settlement with the Libyan Government after arbitration of its claim and it does not now assert any claim against Coastal States.[1] In May 1975 Hunt entered into a settlement agreement with the Libyan Government whereby, for the sum of ap-

---

1. The arbitrator held that Hunt did not acquire title to the oil in the strata.

proximately $19,000,000, it released any and all claims against the Libyan Government arising out of the nationalization of the Sarir field. Coastal States was not a party to this agreement and Hunt now seeks to recover the proceeds realized by Coastal States from oil allegedly purchased from AGECO prior to the May 1975 settlement.

Both the trial court and the court of civil appeals concluded that the trial court was foreclosed from inquiring into the validity of the Libyan nationalization of Hunt's interest in the Sarir field by the Act of State Doctrine. These courts further concluded that as a matter of law, Hunt's actions in giving notice of his claim to oil from the Sarir field did not violate either state or federal law and would not support Coastal States' claim for damages for tortious interference. Hunt and Coastal States both filed applications for writ of error and complain of the take-nothing judgment entered on the claim of each.

### APPEAL BY HUNT

Hunt's claim against Coastal States is necessarily based upon the assertion that Libya's expropriation was invalid so that Coastal States acquired no title from AGE-CO. The critical question involved in Hunt's appeal is the applicability of the Act of State Doctrine and more precisely, whether Hunt's suit comes within the exception to the doctrine created by the Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2). The lower courts have held that the doctrine bars inquiry by a Texas court into the validity of acts done by a foreign sovereign.

■ The Act of State Doctrine is a judicially created doctrine of restraint. The landmark case of Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) reaffirmed the doctrine as originally articulated in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897) in the following language:

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

In Sabbatino it was stated that the doctrine "arises out of the basic relationships between branches of government in a system of separation" and the courts prior recognition of the doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere."

In Hunt v. Mobil Oil Corp., 550 F.2d 68 (2d Cir. 1977), cert. denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477, the Act of State Doctrine was held to bar Hunt's inquiry into the validity of Libya's nationalization of Hunt's concession. In holding that the trial court properly dismissed Hunt's claim against seven major oil producers in the Persian Gulf area for damages under the anti-trust statute, the circuit court said:

"We conclude that the political act complained of here was clearly within the act of state doctrine and that since the disputed pleadings inevitably call for a judgment on the sovereign acts of Libya the claim is non-justiciable."

This final judgment against Hunt in that case controls his present suit for conversion unless it comes within the exception to the Act of State Doctrine created by the Hickenlooper Amendment. Benson v. Wanda Petroleum Company, 468 S.W.2d 361 (Tex. 1971).

The Hickenlooper Amendment was enacted by Congress in 1964 shortly after the Sabbatino holding and in obvious reaction to it. It provides in part:

"[N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in

which a CLAIM OF TITLE OR OTHER RIGHT TO PROPERTY is asserted by any party including a foreign state . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law . . .." (Emphasis Added)

22 U.S.C. § 2370(e)(2). It must be recognized at the outset that this exception which was adopted over the objections of the Executive Department of the United States has been narrowly construed by our courts. *Occidental of Umm Al Qay, Inc. v. Cities Serv. Oil Co.*, 396 F.Supp. 461 (D.C. La.), *aff'd in part*, 577 F.2d 1196 (5th Cir. 1978), *petition for cert. filed*, —— U.S. ——, 99 S.Ct. 1276, 59 L.Ed.2d 491 (1978); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (D.C.Cal.) *aff'd*, 461 F.2d 1261 (9th Cir. 1972), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221; *United Mexican States v. Ashley*, 556 S.W.2d 784 (Tex.1977).

The statute enumerates three requirements which must exist in order to avoid the Act of State Doctrine under the Hickenlooper Amendment. 1. Expropriated property must come within the territorial jurisdiction of the United States. 2. The act of the expropriating nation must be in violation of international law. 3. The asserted claim must be a claim of title or other right to property. 22 U.S.C. § 2370(e)(2). The court of civil appeals concluded, without consideration of the first two requirements, that the Hickenlooper Amendment is not applicable to this case because Hunt acquired only a contract right by the agreement with Libya. We agree with this conclusion and therefore limit our consideration to the third requirement stated above.

■ Since Libya is both the place of the contract's execution and performance as well as the location of the subject matter, Libyan substantive law governs the interpretation and construction of the rights conferred to Hunt by the Concession Agreement. *Cantu v. Bennett*, 39 Tex. 304 (1873).

The Concession Agreement expressly provides that the applicable law is the Libyan Petroleum Law No. 25 of 1955 and this law provides in part:

"(1) All petroleum in Libya in its natural state in strata is the property of the Libyan State.

"(2) No person shall explore or prospect for, mine or produce petroleum in any part of Libya, unless authorized by a permit or concession issued under this Law."

■ The expressed intent of the Concession Agreement was to grant Hunt the *right* to search for and to extract oil within the defined area for the stated term.[2] It did not grant Hunt title to the oil in the strata. Under Libyan law, title to the oil passed at the wellhead. In 1966 Hunt and Libya voluntarily amended the 1957 Concession Agreement. Clause 16 of the amended agreement states:

"(1) The Government of Libya will take all the steps necessary to ensure that the Company enjoys all the rights conferred by the Concession. The CONTRACTUAL RIGHTS expressly created by this concession shall not be altered except by mutual consent of the parties.

"(2) This Concession shall throughout the period of its validity be construed in accordance with the Petroleum Law and the Regulations in force on the date of the execution of the agreement of amendment by which this paragraph (2) was incorporated into this concession agreement. Any amendment to or repeal of such Regulations shall not affect the CONTRACTUAL RIGHTS of the Company without its consent." (Emphasis added)

This language is significant in that it not only refers to Hunt's rights as "contractual," but it also recognizes Libya's ownership

---

**2.** The Concession Agreement provides that the designated area may be reduced at stated intervals during the fifty year term.

of the oil. We conclude that Hunt obtained only a contractual right under the Concession Agreement.

■ The Hickenlooper Amendment by its express terms applies only to a claim of title or other right to property. This construction was made abundantly clear in 1965 when Congress added the words "to property" following the phrase "claim of title or other right." Thus this exception to the Act of State Doctrine has no application here where only a contractual right was expropriated from Hunt. *See Occidental of Umm Al Qay., Inc. v. Cities Serv. Oil Co., supra; French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968); *Menendez v. Saks and Company*, 485 F.2d 1355 (2nd Cir. 1973), *cert. denied*, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976); *Present v. U. S. Life Ins. Co.*, 96 N.J.Super. 285, 232 A.2d 863, *aff'd*, 51 N.J. 407, 241 A.2d 237 (1968). We have been cited to no case, and have discovered no case, holding to the contrary.

■ The trial court and the court of civil appeals did not err in concluding that the Act of State Doctrine bars judicial inquiry into the validity of Libya's actions.

## APPEAL BY COASTAL STATES

We agree with the holding of the court of civil appeals that Hunt's motion for summary judgment was properly granted on Coastal States' claim of tortious interference with business contracts and business relations. Hunt's contractual rights in the Sarir field were expropriated by Libya and Hunt was fully justified in apprising the international community of his intent to file suit if they dealt with oil from this field.

The judgment of the court of civil appeals is affirmed.

Dissenting opinion by STEAKLEY, J., joined by GREENHILL, C. J., and SPEARS, J.

STEAKLEY, Justice, dissenting.

I respectfully dissent.

This is an appeal from two summary judgments. Nelson Bunker Hunt, Herbert Hunt, and Lamar Hunt (hereinafter referred to as "Hunt") sued Coastal States Gas Producing Company and Coastal States Marketing, Inc., (hereinafter referred to as "Coastal States"). Hunt sought judgment "against Coastal States awarding them possession of an undivided one-half of all crude oil or oil products produced from Concession 65 (the Sarir Field) and converted by Coastal States and its assignees, or the proceeds thereof; or, in the event that such crude oil, oil products or proceeds have been commingled with the property of another, for an undivided interest in such property in proportion to their shares of commingled oil, products, or proceeds; or, alternatively, for the fair market value of all such crude oil or oil products converted by Coastal States and its assignees to date of judgment; for an accounting by Coastal States as to the amount of crude oil produced from Concession 65 taken by it or its assignees, the amount of oil products taken by Coastal States and its assignees derived from such crude oil, the consideration received by Coastal States or its assignees for such oil or oil products, and any other matters proper to such accounting; together with exemplary damages, interest, costs of Court and general relief." Coastal States filed a counterclaim alleging tortious interference with its contract and business opportunities. The trial court granted the motion for summary judgment filed by Coastal States against Hunt's suit, and the motion for summary judgment filed by Hunt against Coastal States' suit. The Court of Civil Appeals affirmed. 570 S.W.2d 503. I would reverse the summary judgment in Hunt's action against Coastal States, sever this claim and remand it for trial.

In 1957, the Government of Libya granted Concession Number 65 to Hunt, granting him the right to explore for, drill and extract oil for fifty years in the area hereinafter referred to as the Sarir field. In 1960, Hunt assigned a one-half undivided interest in that concession to British Petroleum Exploration Company, Limited. Oil was discovered in the Sarir field in 1961, and was produced in marketable quantities by 1967.

In 1971, Libya nationalized the interest of British Petroleum in the Sarir field and transferred British Petroleum's interest to the Arabian Gulf Exploration Company (AGECO). Two years later, by enactment of Libyan Law Number 42, Libya nationalized Hunt's interest in the concession without compensation. Hunt's rights and assets were then transferred to AGECO. Hunt published notices throughout the world that the Libyan nationalization of the Sarir field violated international law and threatened suit against anyone who came into possession of oil from the Sarir field. Coastal States entered into a contract with AGECO to purchase oil from the Sarir field at approximately the time the nationalization decree was issued, and first received oil from the Sarir field in May, 1973. Coastal States transported that oil to refineries in Italy and sold the processed products to third parties. The proceeds of these sales accrued to Coastal States, which is incorporated and headquartered in the United States. Coastal States also stipulated that at least a portion of such products were brought into the United States from the refineries in Italy.

In August, 1973, Hunt brought this suit against Coastal States. British Petroleum, originally a co-plaintiff in the suit, took a nonsuit after entering into a settlement with Libya that released Libya and all third parties, thus ending all its claims in regard to oil from the Sarir field.

In May, 1975, Hunt settled his claims against the Libyan government for the nationalization of the Sarir field. Hunt and Coastal States stipulated that Libya's payment of approximately $19,000,000 for that agreement represented only the net book value of Hunt's physical assets located on Concession 65 and "that no portion of such sum was for oil previously sold by AGECO or for oil in place." Hunt's present suit seeks an adjudication with respect to a one-half share of the oil purchased by Coastal States from the date of the expropriation in May, 1973, to the date of Hunt's settlement with Libya in May, 1975.

In Hunt's suit against Coastal States, he alleged that the expropriation by Libya was an illegal confiscation and therefore did not affect his rights to recover against subsequent converters of the oil from the Sarir field. Hunt claimed that Coastal States acquired the oil with full knowledge of Hunt's contrary possessory rights, title and interest. A pre-trial hearing was held with each party calling experts in international and foreign law who expressed their opinions regarding the application of Libyan and international law to the facts of this case. The parties thereafter submitted the motions for summary judgment discussed above.

## I. THE ACT OF STATE DOCTRINE

I would hold that the Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), a statutory exception to the act of state doctrine, is applicable to Hunt's claim and directs a judicial determination on its merits.

The act of state doctrine was articulated in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897): "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." This doctrine was reaffirmed in the landmark case *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). The Hickenlooper Amendment was enacted in reaction to *Sabbatino* and was meant to overrule, in part, that decision. I shall therefore examine *Sabbatino* in some detail.

*Sabbatino* involved a dispute over the proceeds from a ship load of sugar expropriated by Cuba. Farr, Whitlock & Company had contracted to purchase the sugar from the Cuban subsidiary of an American owned firm, C.A.V. All assets of C.A.V. were nationalized after the sugar that was destined for Morocco had been loaded on the ship, but before the ship had left Cuban waters. Farr, Whitlock & Company had to sign duplicate contracts pledging payment to an instrumentality of the Cuban Government in order to obtain permission for the ship to sail.

Subsequently, Cuba's agent in New York, Banco Nacional, and C.A.V. both made demand on Farr, Whitlock & Company for payment for the sugar. Farr, Whitlock & Company refused payment to Cuba's agent. Instead, pursuant to court order, it delivered the funds to Sabbatino, the Temporary Receiver for C.A.V.'s New York assets, to await judicial determination of ownership. Banco Nacional brought suit against Farr, Whitlock & Company, alleging conversion of the fund. The district court dismissed the suit. The Second Circuit Court of Appeals affirmed, holding that the expropriation decree violated international law and therefore did not transfer good title to Banco Nacional. The United States Supreme Court reversed and remanded, holding that the act of state doctrine precluded examination of the validity of the Cuban expropriation. The way was thus cleared for an American court, by refusing to look at the validity of Cuba's expropriation, to validate that expropriation by rendering judgment requiring Farr, Whitlock & Company to pay the proceeds to the last party having possession of the sugar.

The Court examined the foundations of the act of state doctrine and concluded that the doctrine is not compelled by the inherent nature of sovereign authority, by any principle of international law, or by the United States' Constitution. 376 U.S. at 421–23, 84 S.Ct. 923. Rather, the doctrine "arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." *Id.* at 423, 84 S.Ct. at 938. Finally, the Court reasoned that a judicial determination as to the validity of an expropriation by a foreign sovereign within its own territory would have only an occasional impact, would often be likely to offend the expropriating country, and would be a potential source of embarrassment to the Executive Branch in its conduct of possible negotiations with the expropriating country. *Id.* at 431–33, 84 S.Ct. 923. Therefore, as a matter of judicial restraint, the act of state doctrine was applied to preclude inquiry into the validity of this expropriation.

The dissent protested the extension of the act of state doctrine to actions of foreign sovereigns that violate international law.[1] Courts of the United States have long recognized a duty to determine controversies on their merits, according to the applicable law which includes international law.[2] Our courts have never been required to pay unlimited deference to foreign acts of state. The courts of other nations do not follow such an inflexible rule in the protection of their Executive Branch. Furthermore, the adoption of such an inflexible rule is likely to cause as much embarrassment to the Executive Branch as an adjudication on the merits.

1. 376 U.S. at 442–44, n.2, 84 S.Ct. 923, discusses earlier cases invoking the act of state doctrine, showing that those cases did not involve violations of international law.

2. U.S.CONST. art. III, § 2, extends the judicial power "to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) declared that:
    *International law*, in its widest and most comprehensive sense—including not only questions of right between nations, governed by what has been appropriately called the law of nations; but also questions arising under what is usually called private international law, or the conflict of laws, and concerning the rights of persons within the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation—*is part of our law, and must be ascertained and administered by the courts of justice*, as often as such questions are presented in litigation between man and man, duly submitted to their determination.
    The most certain guide, no doubt, for the decision of such questions is a treaty or a statute of this country. But *when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is*, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this, the courts must obtain such aid as they can from judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations. (Emphasis added).

The Hickenlooper Amendment was enacted before the district court had entered judgment on remand. Subsequent to such enactment, the district court, in *Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957, 272 F.Supp. 836 (D.C.N.Y.1965), held that the amendment applied to that case; held that the expropriation by the Cuban government violated international law; and dismissed the suit. The Second Circuit Court of Appeals affirmed, 383 F.2d 166 (1967), holding that the Hickenlooper Amendment did apply that the amendment was constitutional and that the Cuban expropriation violated international law. The Court of Appeals adopted a considerable portion of its prior determination in the case, 307 F.2d 845 (1962). The United States Supreme Court thereafter denied petition for certiorari in the case, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968).

## II. THE HICKENLOOPER AMENDMENT

In the wake of reaction against *Sabbatino*, Congress passed the Hickenlooper Amendment. It became law on October 7, 1964, and was reenacted as permanent law in 1965. It reads as follows:

Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.

22 U.S.C. § 2370(e)(2).

The Senate Report indicates that the amendment was meant to modify the *Sabbatino* decision and to achieve a reversal of presumptions as to the embarrassment caused the Executive Branch by judicial determinations on the merits of controversies that involve an act of state by a foreign sovereign.[3] Under *Sabbatino*, courts were required to refuse adjudication of claims that involved passing on the validity of a foreign country's act of state, presuming that such an adjudication would embarrass the Executive's conduct of foreign policy. The Hickenlooper Amendment directs that courts shall adjudicate such claims, presuming that such an adjudication will *not* embarrass the Executive. This presumption may be rebutted if the President determines that application of the act of state doctrine is required in a particular case by United States' foreign policy interests.[4]

---

3. The amendment is intended to reverse in part the recent decision of the Supreme Court in *Banco de Nacional de Cuba v. Sabbatino.* The act of state doctrine has been applied by U. S. courts to determine that the actions of a foreign sovereign cannot be challenged in private litigation. The Supreme Court extended this doctrine in the *Sabbatino* decision so as to preclude U. S. courts from inquiring into acts of foreign states, even though these acts had been denounced by the State Department as contrary to international law.

    S.Rep. No. 1188, Part I, 88th Cong., 2d Sess. 24 (1964), U.S.Code Cong. & Admin.News 1964, p. 3829.

4. Under the *Sabbatino* decision, the courts would presume that any adjudication as to the lawfulness under international law of the act of a foreign state would embarrass the conduct of foreign policy unless the President says it would not. Under the amendment,

Under the Hickenlooper Amendment, any court in the United States must determine the merits of controversies if (1) any party makes a claim of title or other right to property based upon or traced through a confiscation or taking, (2) the President has not filed with the court a suggestion that the application of the act of state doctrine is required by the foreign policy interests of the United States,[5] and (3) that taking was by a foreign state in violation of the principles of international law. The amendment further directs that the determination be made "giving effect to the principles of international law." Despite the majority's assertion to the contrary, the statute does not require that the expropriated property itself be brought within the territorial jurisdiction of the United States. The amendment does apply to the proceeds of such property.[6] The Hickenlooper Amendment has been narrowly construed by the courts and has been restricted to fact situations closely in point to *Sabbatino.* I would hold that the case at bar is in that class of cases encompassed by the amendment and that

the Court would presume that it may proceed with an adjudication on the merits unless the President states officially that such an adjudication in the particular case would embarrass the conduct of foreign policy.
*Id.*
This is similar to the procedure followed by the Department of State currently regarding sovereign immunity claims. That Department makes a determination whether foreign governments' claims of immunity should be granted in each case where a party seeks to raise the immunity issue. See *Sabbatino,* 376 U.S. at 469, 84 S.Ct. 923; 26 Dept.State Bull. 984–985 (1952), Appendix 2, *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

5. The *Proviso* clause of the amendment also exempts its application "in any case . . . with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking."

6. Although the amendment does not refer specifically to proceeds, it is clear that it was intended to apply to the property as long as it is traceable. The *Sabbatino* case itself involved the proceeds of the expropriated property. The shipment of sugar never came within the territorial jurisdiction of the United States.

our courts are under a duty to make a determination on the merits of this controversy.

### A. *Claim of title or other right to property.*

The majority has concluded that, under Libyan law, Hunt does not have title to oil in strata, but only has a contract right to that oil, and that therefore he has no claim to property as required by the Hickenlooper Amendment. I disagree. The Hickenlooper Amendment does not require proof of title to property; it requires adjudication of controversies when "a claim of title *or other right* to property *is asserted.*" (Emphasis added). The amendment also requires that the determination be made giving effect to the principles of international law, not according to the law of the country that has just accomplished the confiscation.

Significance has been attached to Congress' addition of the words "to property" after the phrase "a claim of title or other right" when it reenacted the amendment

Testimony before legislative committees during consideration of the amendment further reflects this understanding. Professor Louis Henkin, Columbia University Professor of International Law, who testified against the amendment stated: "I do not think it would apply except to property which was itself expropriated in violation of international law; or to that property so long as it is still identifiable; one might change its form somewhat and still identify it." *Foreign Assistance Act of 1965, Hearings on H.R. 7750 Before the House Committee on Foreign Affairs,* 89th Cong., 1st Sess. Part VII, 1070 (1965). Professor Cecil J. Olmstead stated "This [amendment] is designed to go after the property or proceeds of specific property that was illegally taken by the foreign state." *Id.,* Part IV, 610.
The cases also reflect the understanding that the Hickenlooper Amendment applies to proceeds of the property expropriated. "We must thus attempt to identify the 'property'—or the proceeds of such property—which was allegedly 'confiscated or taken' from Ritter by the action of the Cuban Government." *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 58, 295 N.Y.S.2d 433, 445, 242 N.E.2d 704, 713 (1968). See *Banco Nacional de Cuba v. First National City Bank of New York,* 431 F.2d 394, 401–02 (2nd Cir. 1970); *Banco Nacional de Cuba v. Farr,* 383 F.2d 166 (2nd Cir. 1967).

and made it permanent in 1965. A close reading of the legislative history surrounding the adoption of this amendment makes it clear that these words were added to assure the availability of the act of state doctrine as a defense in certain cases where American banks, insurance companies, and other financial institutions that have had reserves expropriated abroad might otherwise be susceptible to multiple liability.[7] This does not preclude the applicability of the amendment. to cases where a contract has granted a party a claim of title or other right to certain tangible property that has been the subject of expropriation by a foreign sovereign. Furthermore, it has long been recognized that contract rights are a form of property protected by the Fifth Amendment. See *United States Trust Co. v. New Jersey,* 431 U.S. 1, 19, n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

The legislative history indicates that the case at bar presents precisely the type of claim that was contemplated by Congress in the passage of the Hickenlooper Amendment. Professor Cecil Olmstead, one of the original authors of the amendment, expected the amendment to apply to contract rights when tangible property or goods claimed under a contract, or proceeds thereof, came into the United States:

7. In 1964, the Hickenlooper Amendment was adopted as a temporary law with the understanding that it would be further considered the following year. In 1965, after additional hearings, the Amendment became permanent law as part of the Foreign Assistance Act of 1965. Two significant changes were made. First, as noted, it was made permanent law. Second, the words "to property" were added as described above. The purpose of that addition was explained in the Senate Report:

The words "to property" have been inserted to make it clear that the law does not prevent *banks, insurance companies, and other financial institutions* from using the act of state doctrine as a defense to multiple liability upon any contract or deposit or insurance policy in any case where such liability has been taken over or expropriated by a foreign state. In such cases, it is not intended to affect any defense previously available to such institutions. (Emphasis added).
S.Rep. No. 170 on S.1837, 89th Cong., 1st Sess. 19 (1965).

I would think that a contract right would [be covered] because there is a property interest in the contractual right of course. We certainly intended a contractual right would be covered here.

Of course, if there was a violation of a contract between a U. S. investor and a foreign state and no proceeds or goods or commodity from the enterprise came into the United States, there would never be an opportunity for this amendment to work.

*Foreign Assistance Act of 1965, Hearings on H.R. 7750 Before the ·House Committee on Foreign Affairs,* 89th Cong., 1st Sess., Part IV, 608 (1965).

Congressman Adair, sponsor of the original amendment in the House, explained its purpose in this manner:

[The amendment] insures that however the case may arise or the act of state doctrine be invoked, a party who had suffered an expropriation in violation [of international law] may bring suit to assert his claim to the expropriated property if there is an attempt to market it in the United States.

110 Cong.Rec. 23680 (1964).

Even an opponent of the amendment, Professor Louis Henkin, admitted its applicability to this type of situation. In a letter submitted in response to a request during

The change was also explained during testimony before the House by Professor Cecil J. Olmstead, Professor of International Law at the New York University School of Law, 1965 President of the American Branch of the International Law Association, assistant to the Chairman of the Board of Texaco, Inc., and one of the original authors of the amendment, speaking on behalf of the Rule of Law Committee:

[T]he amendment has been so drafted as not to affect the act of state doctrine defense when it is asserted by a party which does not derive a claim of title or right through an expropriation (e. g., U. S. bank defending a suit by depositors in a foreign branch that was expropriated or a U. S. insurance company defending a suit on foreign policies backed by reserves that were expropriated abroad).
*Foreign Assistance Act of 1965: Hearings on H.R. 7750 Before the House Committee on Foreign Affairs,* 89th Cong., 1st Sess. Part IV, 593 (1965).

his testimony prior to the amendment's re-enactment, Henkin stated:

> So far as the *Sabbatino* amendment is concerned, it would apply also to expropriations of property owned by nationals of third countries. The famous expropriation by Iran of the Anglo-Iranian Oil Co. is a notable example. *Presumably, if some of that oil had come to the United States, the British company might have traced it here and, under the Sabbatino amendment, an American court would have had to decide whether the nationalization program of the Government of Iran was consistent with international law.* (Emphasis added).

*Foreign Assistance Act of 1965, Hearings on H.R. 7750 Before the House Committee on Foreign Affairs,* 89th Cong., 1st Sess., Part VII, 1076 (1965).

As recognized by the Second Circuit Court of Appeals in *Banco Nacional de Cuba v. First National City Bank of New York,* 431 F.2d 394, 402 (2d Cir. 1970), after studying the legislative intent behind this amendment:

> If one fact is clear from the legislative history, it is that this language [of the Hickenlooper Amendment] was designed to be invoked by American firms in order to afford them "a day in court"—and presumably a monetary recovery—when some other entity attempted to market the American firms' expropriated property and some aspect of such an attempted transaction took place in this country.

The majority cites four cases presumably as support for the holding that the Hickenlooper Amendment is inapplicable because Hunt only acquired a contract right in the Concession Agreement. None of these cases, however, is directly on point, nor does any preclude a holding that a claim to property, granted by contract, is encompassed by the Hickenlooper Amendment. Of the four cases cited, only one actually involved a claim to tangible property that was expropriated and later brought into the United States.

Although the scope of the act of state doctrine must be determined under federal law, see *Sabbatino,* 376 U.S. at 427, 84 S.Ct. 923, the majority has relied on two state court cases. The New York State Court of Appeals decision, *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968), is distinguishable from the case at bar. Plaintiff in that case was holding certain "certificates of tax exemption" that the Cuban Government would no longer redeem. These certificates purported to allow the holder to convert pesos into United States dollars and to take those dollars out of Cuba without paying any exportation tax. The New York Court found that French's only loss was occasioned by a change in Cuban currency regulations and did not therefore constitute a taking of property.[8] Furthermore, *French* involved no expropriated property, or proceeds thereof, brought into the United States. The plaintiff was seeking monetary recovery from an account maintained by Banco Nacional in New York City. The Hickenlooper Amendment was not intended to provide a remedy in this kind of situation. The Court did express, by obiter dicta, the opinion that the Hickenlooper Amendment would not apply to contract claims. The second state court case cited by the majority, *Present v. United States Life Ins. Co.,* 96 N.J.Super. 285, 232 A.2d 863, aff'd, 51 N.J. 407, 241 A.2d 237 (1968),

---

8. A legislator who reduces rates of interest or renders agreements invalid or incapable of being performed or prohibits exports, or renders performance more expensive by the imposition of taxes or tariffs does not take property. Nor does he take property if he depreciates currency or prohibits payment in foreign currency or abrogates gold clauses. Expectations relating to the continuing intrinsic value of all currency or contractual terms such as the gold clause are, like favorable business conditions and good will, "transient circumstances, subject to changes", and suffer from "congenital infirmity" that they may be changed by the competent legislator. They are not property, their change is not deprivation.

Mann, Money in Public International Law, 96 Recueil Des Cours [1959] 1, 90, *quoted in French v. Banco Nacional de Cuba*, 295 N.Y.S.2d at 441, 242 N.E.2d at 710.

did not involve a taking of property as contemplated by the Hickenlooper Amendment, nor did it involve a violation of international law.[9]

*Menendez v. Saks and Co.*, 485 F.2d 1355 (2d Cir. 1973), *cert. denied*, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976), followed the United States Supreme Court decision in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), to avoid strict application of the act of state doctrine. The Court, in following that decision, concluded that "despite the act of state doctrine a counterclaim limited to the amount sought by the foreign sovereign was enforceable." *Menendez*, 485 F.2d at 1373. The Court concluded that the Hickenlooper Amendment did not govern the counterclaim against Banco Nacional and, in dicta, cited *French, supra*. The denial of certiorari by the United States Supreme Court in no way reflects approval of the dicta regarding the Hickenlooper Amendment.[10]

The only case cited that involved property allegedly expropriated and later brought into the United States was *Occidental of Umm Al Qaywayn, Inc. v. Cities Service Oil Co.*, 396 F.Supp. 461 (W.D.La.1975), *dismissed in part, reversed in part*, 577 F.2d 1196 (5th Cir., 1978). Occidental sued Cities Service for the conversion of oil in three tankers, claiming that the oil had been produced from an area of the Persian Gulf in which Occidental held valid concession rights. Cities Service contended that it held the only valid concession rights to the area in dispute. Each company held a concession granted by one of the States bordering the Persian Gulf. The area covered by each concession was defined by the territorial waters of the State granting those rights. The boundary lines were in dispute between these governments, however, with each government claiming the area where this oil was produced. It was never clearly established that *Occidental* had valid concession rights in the area in dispute. The boundary dispute was the crucial factor that led the Fifth Circuit Court of Appeals to hold that the controversy between Occidental and Cities Service involved a political question and was therefore non-justiciable. 577 F.2d 1196. In light of that holding on appeal, I consider the portion of the district court's opinion stating that the Hickenlooper Amendment does not apply to contract claims to be of no significant precedential value.

*Occidental* is further distinguishable from our case at bar because of the applicability of the second proviso of the Hickenlooper Amendment. That proviso precludes application of the amendment when the President "determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this

9. *Present* involved a claim to life insurance proceeds made on a New York insurance company based on a policy sold by that company's Cuban branch. That branch had been nationalized with all assets and liabilities assumed by the Cuban government. The plaintiffs were Cuban citizens at the time of the nationalization, emigrated to the United States, and brought the claim in the United States.

The court accurately pointed out that these persons had no claim to property that had been expropriated. In fact, when Cuba took over the insurance company, it expressly assumed the liabilities to the policy holders. The plaintiffs, however, had made no claim on the policy when they were still in Cuba. Furthermore, there was no violation of international law because the plaintiffs, as citizens of Cuba at the time of the expropriation, were "subject to all

laws enacted by Cuba—and all such laws were binding upon them and upon their property and property rights." 232 A.2d at 873. Although the court finds the Hickenlooper Amendment inapplicable here, it makes no comment concerning the general applicability of the amendment to contract claims.

10. *Menendez* was a suit brought by Cuban interventors (those Cubans placed in control of expropriated cigar factories after expropriation by the government) for sums owed by United States importers. The importers sought an offset of moneys paid erroneously to the interventors for cigars received before the expropriation occurred. As indicated above, the court allowed such offset, refusing to apply the act of state doctrine to validate the interventors repudiation of moneys owed the importers.

effect is filed on his behalf in that case with the court." A letter from the State Department was included in the Government's amicus curiae brief in *Occidental* wherein the opinion was expressed that "it would be contrary to the foreign relations interests of the United States if our domestic courts were to adjudicate boundary controversies between third countries and in particular that controversy involved here." 577 F.2d at 1204, n. 13. Conversely, Hunt has produced expressions from the State Department supporting his pursuit of legal remedies in regard to the oil from the Sarir field, as will be discussed below.

I do not find any of the cases above to be controlling in light of the clear Congressional intent, as discussed previously, to include contractual rights to property within the exception provided by the Hickenlooper Amendment. Indeed, I have been cited to no case, and have discovered no case, holding squarely that a claim to property, granted by contract, is not encompassed by the Hickenlooper Amendment.

Finally, the amendment's application is not restricted to cases where the plaintiff has asserted a claim of title or other right to expropriated property. Rather, the amendment requires a determination on the merits "in a case in which a claim of title or other right to property is asserted *by any party . . . based upon (or traced through) a confiscation or other taking. . . .*" Therefore, by its language, the

Hickenlooper Amendment applies if *either* the plaintiff, or the defendant, claims title or right to property based upon a taking by a foreign country. Clearly, Coastal States, the defendant here, is a party claiming the right to oil from the Sarir field based entirely upon Libya's taking of Hunt's concession rights. In this case, therefore, both the plaintiff, Hunt, and the defendant, Coastal States, are asserting claims of right to property that was expropriated by Libya.

### B. Department of State's Support of Hunt.

The second proviso of the Hickenlooper Amendment exempts its application "in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court." This provision avoids the situation that concerned the United States Supreme Court in *Sabbatino* : that judicial determinations of parties' rights might interfere with, or embarrass, the Executive Branch of the government.[11] There has been no such request filed with any court in this case. In fact, the Department of State has indicated its belief that the Hickenlooper Amendment was passed precisely to permit American courts to entertain suits such as this, brought in pursuit of "hot" oil; that the nationalization of Hunt's interest in the

---

11. The Department of State originally opposed the passage of the Hickenlooper Amendment. However, after the Hickenlooper Amendment was passed, the Department of State took the position that the amendment was valid and constitutional. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 181, n. 16 (2nd Cir. 1967).

The State Department's acceptance of the Hickenlooper Amendment post-*Sabbatino* is further shown in a letter from its Legal Advisor to the Solicitor General, and appended to the majority opinion in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 706–11, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976):

In general this Department's experience provides little support for a presumption that adjudication of acts of foreign states in accordance with relevant principles of interna-

tional law would embarrass the conduct of foreign policy. Thus, it is our view that if the Court should decide to overrule the holding in Sabbatino so that acts of state would thereafter be subject to adjudication in American courts under international law, we would not anticipate embarrassment to the conduct of the foreign policy of the United States.

*Id.* at 710–11, 96 S.Ct. at 1869.

The letter also refers to several recent decisions where courts of other nations have reviewed state acts under international law and noted that "As far as can be determined, this exercise of the judicial function in foreign jurisdictions has not caused serious foreign relations consequences for the countries concerned."

*Id.* at 710, 96 S.Ct. at 1869.

Sarir field by Libya violated international law; and that wherever possible Hunt should be supported in his pursuit of legal remedies.[12] It is apparent, therefore, that the Department of State has determined that adjudication of Hunt's claim by the judicial branch of our government will cause no serious harm or embarrassment to the conduct of foreign policy by the Executive Branch of our government.

12. *Statement by the Department of State on policy on "hot" Libyan Oil*:

Question has been raised in testimony before the Subcommittee on Multinational Corporations of the Senate Committee on Foreign Relations about the policy of the Department of State in respect of "hot" Libyan oil. The statement that follows describes that policy.

.  .  .  .  .

The *purpose of the Sabbatino Amendment*, which is the law today, *is precisely to permit American courts to entertain suits such as those that have been brought in pursuit of "hot" oil.*  .  .  .

.  .  .  .  .

Following . Bunker Hunt's nationalization, representatives of the Company requested the Department to support its litigation in respect of oil believed to originate in the expropriated concession.  .  .  .  It was the conclusion of the Department of State, in light of the illegal nature of the nationalization of Hunt and the implications which that action had for the interests of other U.S. nationals in Libya, and elsewhere, that the U.S. Government could and should take certain steps to support the Hunt Company's position. Hunt, and its concession partner, BP, should, it was thought, pursue their legal remedies wherever possible since a failure to do so would encourage the Libyan Government to continue its policy of expropriating foreign oil companies in violation of international law. Having determined that the nationalization on June 11 was invalid under international law, it was believed that it was important for the U.S. Government to assert that position on behalf of the Hunt Company, a U.S. national, in an attempt to make it as difficult as possible for the Libyan Government to profit by its unlawful acts.  .  .  .

.  .  .  .  .

As noted, the State Department is of the view that the Libyan nationalization decrees . . . are violative of international law. The June decree was discriminatory, arbitrary and not for a public purpose; the September decree made an offer of inadequate compensation and also failed to respect the obligation to arbitrate disputes with concession holders. In these circumstances, and having regard to the foreign policies pursued by the Libyan

## C. *Violation of International Law*

The amendment also requires that the taking by the foreign state be "in violation of the principles of *international law*, including the principles of compensation and the other standards set out in this subsection." The majority does not reach this question since it found the Hickenlooper Amendment inapplicable to the instant case on other grounds.

Government and the state of relations between the Libyan and United States Governments, *it was and remains highly unlikely that the Executive Branch would find it appropriate to request courts in the United States to refrain from passing upon acts of the Libyan Government on grounds of "act of State."* (Emphasis added).

UNITED STATES OF AMERICA'S NOTE VERBALE NO. 59, Presented to Ministry of Foreign Affairs of the Libyan Arab Republic, dated July 5, 1973:

.  .  .  It is clear from those pronouncements [the speech by Chairman Qadhafi, see p. 24 infra, and the official commentary accompanying the law expropriating Hunt's interest] that the reasons for the action of the Libyan Arab Republic Government against the rights and property of the Nelson Bunker Hunt Oil Company were political reprisal against the United States Government and coercion against the economic interests of certain other U.S. Nationals in Libya. Under established principles of international law, measures taken against the rights and property of foreign nationals which are arbitrary, discriminatory, or based on considerations of political reprisal and economic coercion are invalid and not entitled to recognition by other states.

LETTER, From William J. Casey, Under Secretary of State, to G. Henry M. Schuler of Nelson Bunker Hunt, dated August 3, 1973:

I am writing in response to your letter of August 2, 1973 regarding the nationalization on June 11, 1973 of Nelson Bunker Hunt's rights and property in Libya. In your letter, you requested me to approve the release of the text of a diplomatic note transmitted by the U.S. Government to the Government of the Libyan Arab Republic on July 8, 1973, which contained our position with respect to the June 11 nationalization  .  .  .  .

.  .  .  I am enclosing the text of the substance of the note and will provide you with certified copies  .  .  .  as soon as they are available. We have no objection to your using this note in connection with any pending or proposed litigation or in any other way appropriate to the assertion of your legal rights to the nationalized property.  .  .  .

Hunt contends that Libya's expropriation violated international law because it did not provide for prompt, adequate compensation and because it arbitrarily discriminated against him for a political purpose unrelated to any legitimate public interest. In my view, the Hickenlooper Amendment itself requires speedy compensation, equivalent to the full value of the expropriated property.

The amendment refers to the "principles of compensation and the other standards set out in this subsection" as guidelines for the determination of the adequacy of compensation. That subsection, 22 U.S.C. 2370(e)(1), requires the President to suspend assistance to any country expropriating property owned more than 50% by United States' citizens if that government does not, within a reasonable time after the expropriation, take steps to discharge its obligations toward those citizens, "including speedy compensation for such property in convertible foreign exchange, equivalent to the full value thereof, as required by international law . . . ." The statute, therefore, anticipates that United States' citizens will receive the full value of their expropriated property and that such compensation will be forthcoming shortly after the expropriation takes place. Other authority indicates further that the United States expects compensation to its citizens for expropriated property to be reasonably prompt and to be for the full market value.[13]

It is uncontested that Hunt received no compensation from Libya until approximately two years after the expropriation and that the compensation received at that time was limited to the net book value of the physical assets on the concession at the time of the nationalization. The nationalization decree purported to provide some measure of compensation to Hunt. However, the amount of compensation was to be determined by a committee appointed by Libya's oil minister, with no provision for Hunt to produce evidence as to the value of his interest in the Sarir field. Further, the decree explicitly precluded any appeal from the committee's decision. The *Restatement of the Law (Second), Foreign Relations Law of the United States*, § 185 (1965) states that the taking of property by a state is wrongful under international law if, among other things, "there is not reasonable provision for the determination and payment of just compensation." Comment (e) elaborates on this requirement and explicitly refers to two elements of fairness which were denied Hunt: that an impartial tribunal or administrative authority determine his rights, and that he have a reasonable opportunity to obtain and present witnesses and evidence in his own behalf. I conclude that the compensation provisions of the nationalization decree were illusory and did not meet the requirements for adequate compensation.

Coastal States points out that several countries, notably Latin American and Communist countries, do not acknowledge

---

**13.** § 188. Adequacy of Compensation

(1) Compensation, to be adequate in amount within the meaning of § 187, must be in an amount that is reasonable under the circumstances . . . . Under ordinary conditions, . . . *the amount must be equivalent to the full value of the property taken*, together with interest to the date of payment. (Emphasis added).

*Restatement of the Law (Second), Foreign Relations Law of the United States, § 188* (1965).

The President of the United States, in January 1972, drew attention to the importance which the United States attaches to respect for the property rights of its nationals. He stated that the policy of the United States concerning expropriatory acts includes the position that: "Under international law, the United States has a right to expect:

—That any taking of American private property will be nondiscriminatory;

—That it will be for a public purpose; and

—That its citizens will receive prompt, adequate, and effective compensation from the expropriating country."

With regard to current or future expropriations of property or contractual interests of U.S. nationals, or arrangements for "participation" in those interests by foreign governments, the Department of State wishes to place on record its view that foreign investors are entitled to the fair market value of their interests.

Department of State Press Release No. 630, December 30, 1975.

any duty to provide compensation to aliens for expropriated property. There is also disagreement among international law experts as to whether something less than full market value may constitute adequate compensation. However, in the case at bar, we have the additional consideration that the property was *seized as a means of political and economic retaliation against the United States.*

The retaliatory nature of Libya's expropriation of Hunt's interest in the Sarir field is clearly shown in the text of a speech given by Libyan Chairman Mu'ammar al-Qadhafi at a celebration marking the third anniversary of the closing of the United States Air Force Base at Wheelus:

> The United States, which has suffered defeats everywhere, has not yet been taught the final lesson, especially when we see it being quarrelsome in the Arab world and completely siding with Israel . . . *we say with a loud voice that this United States needs to be given a big hard blow on its cold insolent face in the Arab area.*
>
> U.S. policy, brothers, is going to lead to a catastrophe for U.S. interest in the Arab area in particular.
>
> *The time has come for the Arab peoples to confront the United States.* The time has come for the U.S. interest to be threatened earnestly and seriously in the Arab area, regardless the cost . . . .
>
> The United States is still scorning the Arab nation and its rights. It is continuously giving Israel the most modern arms to enable it to humiliate the Arab nation or to conquer at its will or to remain unjustly in the occupied territory. *Also, U.S. (arrogance) is now manifested in the attitude of the oil companies* . . . .
>
> However, the time may come, if it has not already come, for the serious and dangerous confrontation to take place—a confrontation the cost of which we must bear—with the oil companies and with the entire U.S. imperialism.
>
> *On this occasion, the RCC of the Libyan Arab Republic has decided to nationalize the American oil company Bunker Hunt.* (Emphasis added).

There is generally a consensus among authorities that an uncompensated expropriation, when done as an act of retaliation, is contrary to international law. The Second Circuit Court of Appeals reviewed such authorities and concluded:

> Unlike the situation presented by a failure to pay adequate compensation for expropriated property when the expropriation is part of a scheme of general social improvement, confiscation without compensation when the expropriation is an act of reprisal does not have significant support among disinterested international commentators from any country. And despite our best efforts to deal fairly with political and social doctrines vastly different from our own, we also cannot find any reasonable justification for such procedure. Peacetime seizure of the property of nationals of a particular country, as an act of reprisal against that country, appears to this court to be contrary to generally accepted principles of morality throughout the world.

*Banco Nacional de Cuba v. Sabbatino,* 307 F.2d 845, 866 (1962), reaffirmed in *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 183, cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968). I agree with the reasoning of the Second Circuit Court of Appeals and would hold that the expropriation of Hunt's interest in the Sarir field by Libya was without prompt, adequate compensation; that the expropriation was in retaliation against the United States; and that for these reasons the expropriation violated international law.

I would reverse the summary judgment against Hunt and remand his suit against Coastal States for a determination on the merits.

GREENHILL, C. J., and SPEARS, J., join.